**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

RED WINE & BLUE, and OHIO
ALLIANCE FOR RETIRED
AMERICANS,

       Plaintiffs,

  v.

FRANK LAROSE, in his official capacity
as Ohio Secretary of State,
CHARLES L. NORMAN, in his official
capacity as Ohio's Registrar of Motor Vehicles,

       Defendants.

)
)
)
)
) Case No.: 1:25-cv-01760
)
)
)
) Judge Solomon Oliver, Jr.
)
) Mag. Judge James E. Grimes, Jr.
)
)
)
)
)
)
)

---

**AMICUS BRIEF BY THE AMERICA FIRST POLICY INSTITUTE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION
MOTION**

---

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

STATEMENT OF INTEREST ...................................................................................... 1

INTRODUCTION ........................................................................................................ 1

ARGUMENT ................................................................................................................ 2

    I.    Plaintiffs are not likely to succeed on the merits because *Fish v. Kobach* is inapplicable......2

        A.   *Fish* is not binding precedent. ........................................................................ 2

        B.   H.B. 54 is materially different from the Kansas regime addressed in *Fish*. ....................2

    II.   *Fish* should not be adopted as the standard for NVRA compliance....................................4

        A.   *Fish's* presumption-and-rebuttal test is not grounded in the NVRA's text. .....................4

        B.   States are entitled to deference in determining what information is necessary to assess voter eligibility..................................................................................................5

        C.   *Fish* creates a perverse incentive for widespread illegality before preventative measures are taken................................................................................................... 6

    III.  The current scale of the noncitizen-eligibility problem supports prudent preventive measures. ...........................................................................................................8

CONCLUSION .............................................................................................................9

## TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983).................................................................... 4

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ..................................... 5

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021)...........................................4, 6–7

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (plurality opinion) ......................... 4, 6

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016)............................................................. 2, 4–7

*United States v. Wilkes*, 78 F.4th 272 (6th Cir. 2023) .................................................... 4

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................ 2

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XIV ..................................................................................... 5

U.S. Const. art. I, §4, cl. 1 ............................................................................ 5

**STATUTES**

52 U.S.C. §20504(c)(2)(B)................................................................................. 4–5

52 U.S.C. §20504(c)(2)(C) ................................................................................ 4–5

52 U.S.C. §20507 ......................................................................................... 7

52 U.S.C. §21083(a)(1)(A)................................................................................. 7

Ohio Rev. Code §3503.11(A)(1) ........................................................................... 3

**REGULATIONS**

Ohio Admin. Code §4501:1-1-21(C) ....................................................................... 3, 6

Ohio Admin. Code §4501:1-1-21(G)........................................................................ 3

**OTHER AUTHORITIES**

Anna Pingel, *Protecting American Elections from Foreign Influence*, AMERICA FIRST POLICY

INSTITUTE (Dec. 10, 2024) ..................................................................................................8

Jeffrey Passel & Jens Manuel Krogstad, *U.S. Unauthorized Immigrant Population Reached a Record

14 Million in 2023*, PEW RESEARCH CENTER (Aug. 21, 2025) ......................................................8

## STATEMENT OF INTEREST[1]

The America First Policy Institute ("AFPI") is a 501(c)(3) non-profit, non-partisan research institute. AFPI exists to advance policies that put the American people first. AFPI's guiding principles are liberty, free enterprise, national greatness, American military superiority, foreign-policy engagement in the American interest, and the primacy of American workers, families, and communities in all we do.

AFPI has a substantial interest in ensuring that states retain appropriate authority to administer elections and verify voter eligibility, particularly regarding citizenship requirements. AFPI regularly participates as an amicus curiae in cases involving election integrity, federalism, and state sovereignty in voter-roll maintenance, and the interaction between federal election statutes and state election-administration authority. This case presents important questions about the proper balance the National Voter Registration Act ("NVRA") motor-voter provisions and Ohio's authority to use reliable, pre-existing Bureau of Motor Vehicles ("BMV") credentialing records to determine whether an applicant has already demonstrated United States citizenship for purposes of voter-registration eligibility.

AFPI's election-integrity work has consistently shown why objective verification rules are more effective, transparent, and secure than subjective after-the-fact review. AFPI knows that voter-identification requirements help ensure that the voter is who he or she claims to be, provide a more objective alternative to signature matching, increase public confidence, and help make voting systems more uniform and reliable.

## INTRODUCTION

AFPI respectfully submits this amicus curiae brief in support of Defendants and in opposition to Plaintiffs' motion for a preliminary injunction. Citizenship is a threshold qualification for voting in federal and Ohio elections. A registration process that treats a noncitizen credential record as irrelevant would increase the risk that ineligible persons are invited into the registration

---

[1] No counsel for a party authored this brief, in whole or in part, and no person or entity other than amicus curiae made a monetary contribution to the preparation or submission of the brief.

1

system, creating later administrative burdens, potential criminal exposure for applicants, and public distrust. A state may rationally avoid that problem at the front end through common-sense measures like Ohio's H.B. 54.

Plaintiffs' theory depends on extending the Tenth Circuit's decision in *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), to a materially different Ohio law. Even if the facts were comparable, the Court should reject the presumption-and-rebuttal standard in *Fish*, as it lacks grounding in the NVRA's text and subverts sound election-administration principles. Accordingly, Plaintiffs cannot satisfy the preliminary injunction standard's requirement that they establish a likelihood of success on the merits. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs' motion should be denied.

## ARGUMENT

### I.     Plaintiffs are not likely to succeed on the merits because *Fish v. Kobach* is inapplicable.

#### A.     *Fish* is not binding precedent.

Plaintiffs' preliminary injunction motion relies almost entirely on the conclusion of the court in *Fish*, that the NVRA creates a presumption that attestation alone satisfies the minimum information necessary for voter registration eligibility assessment. *See Fish*, 840 F.3d at 738. However, this Court sits in the Sixth Circuit, and Plaintiffs point to no cases where the Sixth Circuit has adopted *Fish*'s presumption-and-rebuttal framework. As an out-of-circuit decision, *Fish* only carries such persuasive force as its reasoning may warrant.

#### B.     H.B. 54 is materially different from the Kansas regime addressed in *Fish*.

The central factual premise of Plaintiffs' argument is wrong. The critical factual distinction between Ohio's H.B. 54 and Kansas's SAFE Act lies in the pre-existing documentary requirements in Ohio's BMV credentialing process. Kansas required documentary proof of citizenship as a separate voter-registration condition. *Fish*, 840 F.3d at 717. In *Fish*, the Tenth Circuit was primarily concerned that Kansas had imposed an additional documentary obligation on voter-registration applicants and that the burden was not justified by the evidentiary record vis-à-vis the risk of

2

suppressing voter registration and participation. *See id*. at 722, 752–53. That concern is unwarranted here.

Ohio's BMV credentialing process requires documentary proof of legal presence and employs standardized categories of acceptable documents. Ohio Admin. Code §4501:1-1-21(C), (G). These documents conclusively establish the citizenship or non-citizenship of the applicant. No argument has been advanced that this process is contrary to law.

This pre-existing process means that by the time an individual approaches the BMV to renew a current credential or one that has been expired for less than six months, the BMV has already collected and verified documentary evidence regarding that person's citizenship status: it *does not* create a new documentary obligation on voters when they attempt to register. H.B. 54 operates against this backdrop of pre-existing credentialing documentation,[2] directing BMV personnel to offer voter registration when citizenship has been shown, including citizenship previously shown in the BMV's records. Ohio Rev. Code §3503.11(A)(1). In essence, H.B. 54's core change is to direct BMV personnel to affirmatively offer voter registration to applicants that have already conclusively proven their eligibility. Notably, nothing in Ohio law prevents ineligible voters, including those who may become eligible by election day, from requesting a voter registration application of their own accord.

Therefore, H.B. 54 is categorically different from the Kansas-style across-the-board requirement that every registrant affirmatively produce new documentary proof of citizenship for voter-registration purposes. H.B. 54 creates no new burden to produce documents when registering to vote; rather, it simply requires offering registration to proven citizens based on documentation already established in BMV records or on documentation the applicant has already presented as required by Ohio law. *See* Ohio Rev. Code §3503.11(A)(1). Such a structure is consistent with the

---

[2] Ohio's BMV credentialing process already requires first-time applicants for Ohio credentials (or applicants whose credentials have been expired for more than six months) to present identification documents sufficient to establish full legal name; date of birth; social security number; Ohio residential address; and status as a citizen, permanent resident, or temporary resident of the United States. Ohio Admin. Code §4501:1-1-21(C).

3

NVRA. The Supreme Court has repeatedly recognized that states have important interests in orderly, reliable election administration. *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 681 (2021); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality opinion). Reasonable, nondiscriminatory rules that protect the integrity and reliability of the electoral process ordinarily receive substantial respect. *See Crawford*, 553 U.S. at 196–97 (plurality opinion); *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983). The NVRA was designed to facilitate voter registration for eligible citizens through motor-vehicle offices, not to compel states to offer voter registration to persons whose official motor-vehicle records already demonstrate ineligibility.

**II.     *Fish* should not be adopted as the standard for NVRA compliance.**

Even apart from the factual differences between the Kansas SAFE Act and H.B. 54, this Court should decline to adopt *Fish* as the governing standard for NVRA compliance. *Fish* imposes a judge-made burden on states that does not appear in the NVRA, undervalues state authority over elections, and creates an administratively backward incentive structure.

**A.     *Fish*'s presumption-and-rebuttal test is not grounded in the NVRA's text.**

The NVRA's motor-voter provision requires that a driver's-license voter-registration application "may require only the minimum amount of information necessary" to prevent duplicate voter registrations and enable the state to assess eligibility. 52 U.S.C. §20504(c)(2)(B). The motor-voter provision also requires a statement that specifies each eligibility requirement, contains an attestation that the applicant meets those requirements, and requires the applicant's signature under penalty of perjury. *Id*. §20504(c)(2)(C). These provisions must be read together, but they are not identical. One provision concerns the amount of information necessary to assess eligibility; the other requires an attestation. Treating attestation as presumptively sufficient in every case collapses the two provisions and risks rendering Congress's separate minimum-information clause largely superfluous. *See United States v. Wilkes*, 78 F.4th 272, 280 (6th Cir. 2023) (courts generally avoid statutory readings that render words superfluous).

The better reading is straightforward: the NVRA requires an attestation, but it does not forbid a state from using official information already in the possession of the motor-vehicle agency to determine whether an applicant is eligible to be offered voter registration. The attestation requirement prevents states from omitting the sworn eligibility statement; it does not require states to pretend that a noncitizen applicant's BMV record does not exist. And it does not require courts to determine how many ineligible registrations a state must tolerate before adopting preventive measures. If Congress had intended to create a conclusive attestation rule, it could have said so. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013).

To arrive at the presumption-and-rebuttal framework, the court in *Fish* reasoned backwards from section 20504(c)(2)(C). Assuming that the attestation does not violate the minimum information necessary, and that the federal government conditions access to various other benefits on a sworn attestation, the court interpreted the section 20504(c)(2)(C) attestation as a presumptive minimum. *Fish*, 840 F.3d at 737–38. Then, to avoid rendering the minimum-information clause superfluous, the court concluded that section 20504(c)(2)(B) permits further verification only if deemed necessary upon evidence of illicit registrations. *See id*. at 738–39.

The presumption-and-rebuttal framework is a judicial construction, not a reading of the NVRA's text. Section 20504(c)(2)(B) creates a permissive framework for the state to require information necessary to assess eligibility within the bounds of federal law. The NVRA's structure confirms the point. Congress enacted a statute that both facilitates registration and preserves the states' duty to determine voter eligibility.

**B.      States are entitled to deference in determining what information is necessary to assess voter eligibility.**

Citizenship is a foundational eligibility requirement under both state and federal law. U.S. Const. amend. XIV. States have the primary responsibility to administer elections subject to federal constitutional and statutory constraints. U.S. Const. art. I, §4, cl. 1. Within those constraints, courts should recognize the deference owed to states in election administration. *See Inter Tribal Council of Ariz.*, 570 U.S. at 16–17.

Ohio's motor-voter program illustrates why state latitude is appropriate. The BMV already collects legal-presence and citizenship documentation for credentialing purposes. Ohio Admin. Code §4501:1-1-21(C). H.B. 54 merely uses the information already collected within the state process to fulfill the federal requirements to verify the eligibility of a registrant with no additional, duplicative documentary burden. H.B. 54 is a reasonable eligibility-screening measure that respects both the NVRA's attestation requirement and the state's legitimate interest in verifying citizenship before registration. And it creates minimal to no disruption from the perspective of the applicant.

The Supreme Court's voter-identification cases reinforce the principle that states may adopt preventive election-integrity measures before fraud or ineligible voting become outcome-determinative. *Crawford* recognized that states have legitimate interests in deterring and detecting fraud, modernizing election procedures, and safeguarding voter confidence. 553 U.S. at 191–97 (plurality opinion). In *Brnovich*, the Court likewise recognized that "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Brnovich*, 594 U.S. at 685 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*)). That is true even when the record does not show that fraud is widespread. *See id*. at 686 ("[I]t should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders."). Those principles apply with special force to citizenship verification, where the eligibility line is categorical and where the state has reliable official records already available. Courts should not impose a judicial presumption that overrides state judgments about what information is necessary, especially when the state's approach remains consistent with the NVRA's core requirements.

C.     ***Fish* creates a perverse incentive for widespread illegality before preventive measures are taken.**

The most serious flaw in *Fish* is practical. *Fish* requires a state to prove a large volume of illegal registrations or votes before it may adopt preventive measures. *Fish*, 840 F.3d at 746–47. This inverts sound election-administration principles. Election administration depends on prevention, as elections are highly publicized affairs where after-the-fact cleanup is controversial and difficult

6

to implement. *See Brnovich*, 594 U.S. at 672 ("Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome."). Once an ineligible registration enters the rolls, the state must identify the error, match records, satisfy notice and timing requirements, avoid improper removals, preserve records, and potentially defend its actions in litigation. *See, e.g.*, 52 U.S.C. §20507 (setting forth requirements for administration of voter registration, including proper procedures for removing the names of ineligible voters from the voter rolls). This process is slow, expensive, and more error-prone than preventing known ineligible registrations at the point of application. The law should not force states to accept preventable risk until it becomes substantial in the eyes of a court applying *Fish*'s evidentiary standard.

The problem is especially acute for noncitizen registration. Citizenship information is not stored in one universally complete state election database. Election officials may need to rely on BMV records, Department of Homeland Security data, Social Security Administration records, court records, jury responses, self-reported information, and local election records. These systems do not always update simultaneously. Names change. Addresses change. Immigration statuses change. Data fields may be incomplete. A person may be lawfully present for licensing purposes but ineligible for voter registration. A litigation rule that forces the state to wait until these data problems produce enough unlawful registrations to satisfy a court-made threshold undermines responsible administration. Election integrity is better served by allowing states to employ reasonable verification measures prospectively, rather than requiring them to wait for widespread illegality to materialize.

The NVRA itself recognizes that accurate voter rolls are a federal interest. Section 20507 requires states to conduct a general program that makes a reasonable effort to remove ineligible voters from official lists because of death or change in residence. 52 U.S.C. §20507(a)(4). The Help America Vote Act ("HAVA") likewise requires each state to maintain a centralized, computerized statewide voter-registration list. 52 U.S.C. §21083(a)(1)(A). These provisions reflect Congress's judgment that access and accuracy must coexist. Plaintiffs' theory would elevate one provision of the NVRA into a command that disables another core election-administration function.

7

**III.     The current scale of the noncitizen-eligibility problem supports prudent preventive measures.**

The country has been faced with unprecedented levels of illegal immigration in recent years, with conservative estimates of fourteen million unauthorized immigrants residing in the U.S. as of 2023.[3] This issue has increasingly become a topic of national concern. In this environment, states should not be forced into a reactive posture, where they must wait for hundreds of illegal registrations, undermining the security and integrity of nationwide elections, before they may take reasonable preventive steps. Accordingly, this case must be considered against a broader national context in which citizenship verification has become increasingly important. Recent Pew Research Center estimates indicate that the unauthorized immigrant population reached approximately fourteen million in 2023 after the largest two-year increase on record.[4] Pew further estimated that 9.7 million unauthorized immigrants were in the U.S. workforce in 2023, a record high.[5] These figures demonstrate why states must treat citizenship verification as an urgent administrative priority.

The risk is not limited to unauthorized immigrants. Many noncitizens lawfully present in the United States may obtain driver's licenses or identification cards. That fact is unobjectionable as a licensing matter, but it creates a practical election-administration challenge when the same agency transaction is also a voter-registration opportunity. Election systems become vulnerable when states combine noncitizen driver's-license eligibility, automatic or motor-voter registration systems, and insufficient voter-roll maintenance.[6] The solution is not to deny lawful noncitizens

---

[3] Jeffrey Passel & Jens Manuel Krogstad, *U.S. Unauthorized Immigrant Population Reached a Record 14 Million in 2023*, PEW RESEARCH CENTER (Aug. 21, 2025), https://www.pewresearch.org/race-and-ethnicity/2025/08/21/u-s-unauthorized-immigrant-population-reached-a-record-14-million-in-2023/.

[4] *Id.*

[5] *Id.*

[6] Anna Pingel, *Protecting American Elections from Foreign Influence*, AMERICA FIRST POLICY INSTITUTE (Dec. 10, 2024), https://www.americafirstpolicy.com/issues/protecting-american-elections-from-foreign-influence.

licenses. The solution is to ensure that licensing records accurately distinguish citizens from noncitizens and that the voter-registration process respects that distinction.

Ohio's law does exactly that. It uses the BMV's pre-existing documentary-status process to require offering voter registration only to applicants who have established citizenship in that process. That approach is moderate, tailored, and administrable. It is less burdensome than the alternative Plaintiffs' theory demands—allowing questionable registrations into the system and attempting to identify and remove them later. And it supports the public interest in sound and secure elections.

## CONCLUSION

For these reasons, the America First Policy Institute respectfully requests that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: June 11, 2026

Respectfully submitted,

s/ *Andrew D. McCartney*
Andrew D. McCartney (0099853)*
*Counsel of Record*
ASHBROOK BYRNE KRESGE FLOWERS LLC
PO Box 8248
Cincinnati, OH 45249
Tel: (202) 808-5168
Fax: (513) 216-9882
admccartney@abkf.com

Isaac A. Loring (pro hac vice motion pending)
AMERICA FIRST POLICY INSTITUTE
Center For Litigation
1455 Pennsylvania Avenue NW, Suite 225
Washington, D.C. 20004
Tel: (571) 267-9672
iloring@americafirstpolicy.com

*Counsel for Proposed Amicus Curiae the America First Policy Institute*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2026, the foregoing was filed with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance. Parties may access this filing through the Court's system. In addition, a copy of the foregoing is being emailed to all counsel of record.

s/ *Andrew D. McCartney*
Andrew D. McCartney (0099853)

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this case has not been assigned to a track and that this brief adheres to the page limitation specifications of Northern District of Ohio Local Civil Rule 7.1(f).

s/ *Andrew D. McCartney*
Andrew D. McCartney (0099853)