UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RED WINE & BLUE, *et al.*,<br><br>Plaintiffs<br><br>v.<br><br>FRANK LAROSE, in his official capacity as Ohio Secretary of State, *et al.*,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:25 CV 1760<br><br>JUDGE SOLOMON OLIVER, JR.<br><br><br><br><br><br><br><br>ORDER |

Currently pending before the court in the above-captioned case is Plaintiffs Red Wine & Blue and Ohio Alliance for Retired Americans' Motion for Preliminary Injunction ("Motion") (ECF No. 29). For the following reasons, the court grants Plaintiffs' Motion for Preliminary Injunction.

## I. INTRODUCTION

The right to vote is fundamental, as it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.") To exercise that right, people in nearly every state must be registered to vote with the appropriate State elections authority.[1] How that person registers, however, varies from state-to-state.

---

1 *See Voting in North Dakota*, N. D. SEC'Y OF STATE, https://www.sos.nd.gov/elections/voter/voting-north-dakota (last visited Aug. 14, 20216 ("North Dakota does not require voter registration, but you do need to have a valid form of identification that can be used for voting.").

In Ohio, "[o]nly a citizen of the United States, of the age of eighteen years, who has been a resident of the state, county, township, or ward, such time as may be provided by law, and has been registered to vote for thirty days," qualifies as an elector and can vote in all elections. OHIO CONST., art. V, § 1. *See also* Ohio Rev. Code § 3503.01(A). People may register to vote, or change their registration to reflect a new address or name, by mail, online, or in person. *See* §§ 3503.19, 3503.20.

All of these voter registration methods require applicants to answer certain questions and provide specific personal information, including:

1) Are you a U.S. citizen? (Yes or No)
2) Will you be at least 18 years of age on or before the next general election? (Yes or No)
3) Name (First, Last, Middle, Suffix)
4) Residential Address (County, Address, City, Apt or Lot #, Zip Code)
5) Birthdate (Month, Day, Year)
6) Driver's license or state identification number; or, if the applicant does not have a driver's license or state identification number, the last four digits of their Social Security number.

*See* Ohio Rev. Code § 3503.14.[2] If registering to vote by mail, applicants enter these details into the Ohio Voter Registration Form ("Ohio Form") (Pls.' Ex. 3), and then sign and date it. Next to the signature box, the Ohio Form reads:

> I declare under penalty of election falsification that I am a citizen of the United States, will have lived in this state for 30 days immediately preceding the next election, and will be at least 18 years of age at the time of the general election.

*Id.* Once the Ohio Form is filled out, the applicant mails it to the board of elections or Secretary of

---

[2] If the applicant is updating his or her residential address or legal name, the Ohio Form provides fields for the applicant's former address and former name and signature. An applicant may also provide a mailing address if different from the residential address, and a phone number. (Pls.' Ex. 3.)

State. No additional documentation is needed.[3]

If applying online, individuals must provide the same information required by the Ohio Form, but must include both their Ohio driver's license or Ohio identification card number *and* the last four digits of their Social Security number. *See* Ohio Rev. Code § 3503.20. A signature is not required, but applicants must check a series of boxes declaring under penalty of election falsification that the information entered into the online form is accurate. *Id.* As with registering by mail, an applicant need only submit the online form. No other documentation is needed.

Additionally, individuals can register to vote in person by visiting a number of different public offices, buildings, or designated agencies, filling out the Ohio Form while there, and then submitting it to the location official in charge of voter registration. *See* §§ 3503.10, 3503.19. People can also register to vote in person through another person, *i.e.*, filling out a Ohio Form at a farmers market and handing it to another person who delivers it to the county board of elections office. *See* § 3503.19 For all of these registration methods, applicants need only fill out and submit the Ohio Form.

One final way individuals can register to vote in person is by applying simultaneously with a driver's license or state identification card application through the registrar or deputy registrar of the Bureau of Motor Vehicles ("BMV"). Ohio Rev. Code § 3503.11. This "motor voter" law provides, in relevant part:

> When any person applies for a driver's license, commercial driver's license, a state of Ohio identification card, [...] or motorcycle operator's license or endorsement, or the renewal or duplicate of any license [...], *and the person presents proof of United States*

---

[3] Eligible citizens can also register to vote by mail by filling out and submitting to the board of elections the Federal Voter Registration Form. (Pls.' Ex. 4.)

> *citizenship to the registrar of motor vehicles or the deputy registrar or has previously presented proof of United States citizenship to the registrar or any deputy registrar*, the registrar or deputy registrar shall offer the applicant the opportunity to register to vote or to update the applicant's voter registration by electronic means in conjunction with the person's transaction with the registrar or deputy registrar, in a manner prescribed by the secretary of state.

Ohio Rev. Code § 3503.11(A)(1) (as amended June 30, 2025) (emphasis added). Notably, unlike Ohio's other voter registration methods, this process asks applicants to "present proof of United States citizenship."

Ohio law defines "proof of United States citizenship" as "evidence that an individual is a Unites States citizen[.]" § 3501.01(EE)(1). Acceptable "evidence" includes documents like a U.S. birth certificate, a current U.S. passport or passport card, a certificate of naturalization or citizenship, a current driver's license or state identification card issued on or after April 7, 2023, or a notice indicating that a person's application for a replacement naturalization/citizenship document has been approved. § 3501.01(EE)(1)(b)–(f). People may also present as evidence the number of their current Ohio driver's license or state identification card, "if the secretary of state verifies using information obtained from the bureau of motor vehicles that the individual has submitted documentation to the bureau that indicates that the individual is a United States citizen[.]"§ 3501.01(EE)(1)(a). Thus, unlike Ohio's other voter registration methods, the State's motor voter process demands more than the information required on the Ohio Form.

This case asks whether the National Voter Registration Act ("NVRA" or the "Act") preempts Ohio's motor voter law because the Ohio law only requires the BMV registrar or deputy registrar to offer driver's license applicants the opportunity to register to vote if the applicant "presents proof of United States citizenship," or has previously done so. Plaintiffs Red Wine & Blue ("RWB") and

the Ohio Alliance for Retired Americans (the "Alliance") (collectively, "Plaintiffs") argue that § 3503.11(A)(1), as amended by House Bill 54 ("H.B. 54"), conflicts with the NVRA because it requires people seeking to register to vote at the BMV in conjunction with their driver's license application or renewal to produce documentary proof of citizenship ("DPOC") before registering. Such a requirement, Plaintiffs contend, is preempted by the National Voter Registration Act because it exceeds "the minimum amount of information necessary" to assess an applicant's eligibility to vote. (Mot. at PageID 362, ECF No. 29) (quoting 52 U.S.C. § 20504(c)(2)(B)).

Defendants Ohio Secretary of State Frank LaRose and Ohio's Registrar of Motor Vehicles Charles L. Norman (collectively, "Defendants"), contend that Ohio's motor voter law does not conflict with the NVRA because it is not a DPOC requirement. More fundamentally, however, Defendants maintain that Plaintiffs lack Article III standing to challenge § 3503.11(A)(1), as amended by H.B. 54, and thus Plaintiffs' Motion for a Preliminary Injunction must be denied and the case dismissed. (Opp'n at PageID 1119–22, ECF No. 35 )

Having considered the parties' briefings, exhibits, and oral arguments at the June 25, 2026 Hearing, the court finds that Ohio's process for offering voter registration simultaneously with driver's license applications does not comply with Section 5 of the NVRA. Furthermore, the court concludes that Ohio's motor voter statute, § 3503.11(A)(1), as amended by H.B. 54, conflicts with Section 5 of the NVRA, and is therefore preempted.

To reach this conclusion, the court first interprets the NVRA's general mandate that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration." 52 U.S.C. § 20504(a)(1). Then, the court evaluates Ohio's BMV voter registration

process against this rule.

From there, the court turns to the Plaintiffs' alleged injuries, and concludes that Plaintiffs are likely to establish each element of standing under Article III. As part of this discussion, the court interprets Ohio Revised Code § 3503.11, as amended by House Bill 54, the law Plaintiffs seek to enjoin. The court finally turns to the merits of Plaintiffs' preemption claim, as well as the other preliminary injunction factors.

## II. BACKGROUND

### A. Statutory Background

#### *1. The National Voter Registration Act*

The Election Clause of the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1. In other words, the Elections Clause "imposes the duty to prescribe the time, place, and manner of electing Representatives and Senators," upon the States; and, "it confers the power to alter those regulations or supplant them altogether[,]" upon Congress. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013).

The Supreme Court recognizes that the substantive scope of the Elections Clause "is broad," and has held that it encompasses regulations related to voter registration, recounts, and primaries. *Id.* (citing *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *Roudebush v. Hartke*, 405 U.S. 15, 24–25 (1972); and *United States v. Classic*, 313 U.S. 299, 320 (1941)). In effect, the Clause acts as "a default provision; it invests the State with responsibility for the mechanics of congressional

elections, but only so far as Congress declines to preempt state legislative choices[.]" *Foster v. Love*, 522 U.S. 67, 69 (1997) (cleaned up). Accordingly, "it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Id.* (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–833 (1995)). *See also Inter Tribal*, 570 U.S. at 9 (applying Election Clause preemption principles to Section 9 of the NVRA).

In 1993, Congress passed the National Voter Registration Act, thereby exercising its Election Clause power to alter State regulations governing voter registration processes for federal elections. Consistent low voter turnout in federal elections motivated Congress to enact the NVRA. *See* S. REP. NO. 103-6, at 2 (1993) ("The declining numbers of voters who participate in Federal elections...spurred the Committee's search for possible remedies[.]"). Lawmakers found that nearly 70 million eligible citizens did not participate in the 1992 federal election because they were not registered to vote, and that the most common excuse eligible citizens indicated for failing to vote was not being registered. *Id. See also* H.R. REP. NO. 103-9, at 3 (1993) ("Public opinion polls, along with individual testimony received...indicate that failure to become registered is the primary reason given by eligible citizens for not voting.") Given these findings, lawmakers believed that "Congress should assist in reducing barriers, particularly government-imposed barriers, to applying for registration wherever possible." H.R. REP. NO. 103-9, at 3.

The Act "requires States to provide simplified systems for registering to vote in federal elections[.]" *Young v. Fordice*, 520 U.S. 273, 275 (1997) (emphasis omitted). The purposes of the Act are: (1) to establish procedures that increase the number of eligible citizens registering to vote; (2) to enhance participation of eligible citizens as voters in federal elections; (3) to protect the

integrity of the electoral process; and (4) to ensure accurate and current voter registration rolls are maintained. 52 U.S.C. § 20501; *see also Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833 (6th Cir. 1997) (explaining that Congress passed the NVRA "in an attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements"). To that end, the NVRA requires States to provide voter registration procedures for federal elections in three ways:

> (1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 20504 of this title; (2) by mail application pursuant to section 20505 of this title; [and] (3) by application in person [...] (B) at a Federal, State, or non governmental office designated under section 20506 of this title.

§ 20503(a). These procedures therefore ensure that "whatever else the states do, simple means are available to register for federal elections and those means are actively presented to voters by the states." *Fish v. Kobach*, 840 F.3d 710, 721 (10th Cir. 2016).

In crafting the Act, Congress considered a number of proposals to make the voter registration process more accessible, while continuing to ensure the validity of the voter rolls. Of all the proposals, lawmakers determined that "the broadest, most effective and cost-efficient method of registration would be the simultaneous application procedure [...] i.e. a driver's license application serving as an application for registration." H.R. REP. NO. 103-9, at 4. *See also* S. REP. NO. 103-6, at 5 ("[a] voter registration system tied to the application for or the renewal of a motor vehicle driver's license would be an ideal way to register most people of voting age throughout the country."). Thus, lawmakers detailed Section 5, titled "Simultaneous application for voter registration and application for motor vehicle driver's license," first.

After the bill advanced through the necessary committees in each chamber, the House and

Senate passed their own versions. *See* 139 CONG. REC. S2981–82, 139 CONG. REC. S2987-3007 (daily ed. March 17, 1993);139 CONG. REC. H505-29 (daily ed. Feb. 4, 1993). The bills were largely similar, but the Senate version contained several amendments requiring reconciliation with the House version. One such amendment, which the Senate approved by a voice vote, read: "Nothing in this Act shall be construed to preclude a State from requiring presentation of documentary evidence of the citizenship of an applicant for voter registration." 139 Cong. Rec. S3007 (daily ed. March 17, 1993).

During the reconciliation process, House and Senate lawmakers stripped out the documentary proof of citizenship provision, because it was "not necessary or consistent with the purposes of [the] Act." H.R. REP. NO. 103–66, at 23 (1993) (Conf. Rep.). Conferees also expressed concern that the provision

> could be interpreted by States to permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act. It could also adversely affect the administration of the other registration programs as well.

*Id.* Shortly after the release of the conference committee report, House and Senate conferees presented the amended version of the bill to their respective chambers.

On May 5, 1993, the House approved the NVRA, as amended, by a bipartisan vote of 259 to 164. 139 CONG. REC. H2276 (daily ed. May 5, 1993) (Roll Call Vote No. 154). Prior to the final vote, Representative Robert L. Livingston (LA) moved to recommit the conference report back to the conference committee to re-add the excluded proof of citizenship provision. House lawmakers rejected the motion on a bipartisan vote of 170 to 253. *Id.* at H2275 (Roll Call Vote No. 153). Senators also debated the omission of the proof of citizenship section before ultimately passing the bill by a bipartisan vote of 62 to 36. 139 Cong. Rec. S5735–36, S5739–49 (daily ed. May 11, 1993)

(Vote No. 119).

President Bill Clinton signed the NVRA into law on May 20, 1993. *See* Pub. L. No. 103-31, 107 Stat. 77 (codified at 52 U.S.C. 20501–11). At the signing ceremony, he said:

> As many as 35 percent of otherwise eligible voters in our Nation are not registered, and the failure to register is the primary reason given by eligible citizens for their not voting. The principle behind this legislation is clear: Voting should be about discerning the will of the majority, not about testing the administrative capacity of a citizen.

William J. Clinton, President of the United States, Remarks on Signing the National Voter Registration Act of 1993 (May 20, 1993), *in* Weekly Compilation of Presidential Documents, May 1993, Vol. 29 at 914, 915.

Congress has not enacted any substantive amendments to the NVRA since it passed 33 years ago. Shortly after the Act took effect, some states refused to implement it, arguing it violated the Tenth Amendment and interfered with the Voter Qualifications Clause, Art. 1, sec. 2, cl. 1. The Sixth Circuit considered the NVRA's constitutionality in *Association of Community Organizations for Reform Now v. Miller*. There, Michigan voters, the United States, and civic engagement groups sued the State of Michigan to enforce compliance with the Act after the State's Governor issued an order declaring that state agencies would not start providing voter registration services until the federal government funded the process. 129 F.3d at 835. The State of Michigan argued the Act violated the Tenth Amendment because it compelled state legislation to effectuate a federal program, toward a federal purpose, and on the state's own dime. *Id.* at 836.

The Sixth Circuit affirmed the lower court's order upholding the constitutionality of the NVRA and requiring Michigan's compliance with the Act. *Id.* at 838. *Miller* explained that, "[i]f Congress determines that the voting requirements established by a state do not sufficiently protect

the right to vote," then the Elections Clause, Art. I, sec. 4, cl. 1, gives Congress express authority "to alter state legislation as a means of regulating federal elections." *Id.* at 837. Thus, the Sixth Circuit made clear that the NVRA is constitutional. So too has the Seventh Circuit. *See Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 792–96 (7th Cir. 1995) (holding "motor voter" law is a constitutional exercise of Congressional power under the Elections Clause, Art. I, sec. 4, cl. 1). The Ninth Circuit in *Voting Rights Coalition v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995), likewise concluded that the NVRA, "on its face, fits comfortably within [the Elections Clause] grasp." Accordingly, the NVRA as enacted in 1993 has remained a consistent force in ensuring States "provide simplified systems for registering to vote in federal elections[.]" *Fordice*, 520 U.S. at 275.

*2. Ohio's Motor Voter Statute*

Ohio amended its voter registration laws to implement the NVRA in 1994. *See* Sub. S.B. 300, 120th Gen. Assemb., Reg. Sess. (Ohio 1994). As related to voter registration at the BMV, lawmakers modified their pre-NVRA motor voter statute to read:

> When any person applies for a driver's license, commercial driver's license, a state of Ohio identification card issued under section 4507.50 of the Revised Code, or motorcycle operator's license or endorsement, or the renewal or duplicate of any license or endorsement under Chapter 4506. or 4507. of the Revised Code, the registrar of motor vehicles or deputy registrar *shall offer* the applicant *the opportunity to register to vote* or to update his voter registration.

*Id*. (emphasis added).[4]

---

[4] Prior to the enactment of the NVRA, 27 states, including Ohio, and the District of Columbia had voter registration systems through the state's department of motor vehicles. *See* S. REP. NO. 103-6 at 7–10. Ohio's pre-NVRA motor voter statute read:

> When any person applies for a driver's license, commercial driver's

This language remained largely unchanged until 2024, when Ohio lawmakers amended the last line of the provision to read:

> ...the registrar of motor vehicles or deputy registrar shall offer the applicant the opportunity to register to vote or to update the applicant's voter registration *by electronic means in conjunction with the person's transaction with the registrar or deputy registrar, in a manner prescribed by the secretary of state.*"

Sub. H.B. 74, 135th Gen. Assemb., Reg. Sess. (Ohio 2024) (emphasis added). Notably, when H.B. 74 was initially introduced, the bill concerned only the state's information technology systems. By the time it passed, however, the bill mainly dealt with Ohio's election laws. *Compare id. with* H.B. 74, 135th Gen. Assemb., Reg. Sess. (Ohio 2023) (As Introduced).

The following year, lawmakers amended Ohio's motor voter law once again. House Bill 54 began as a transportation appropriations bill. *See* H.B. 54, 136th Gen. Assemb., Reg. Sess. (Ohio 2025) (As Introduced). However, prior to the bill's first passage in the House, lawmakers amended Ohio's motor voter statute by adding a new subsection:

> subject to division (A)(1)(b) of this section,...(b) The registrar or a deputy registrar shall not offer the opportunity to register to vote to a person who, according to the records of the bureau of motor vehicles,

---

license, a state of Ohio identification card issued under section 4507.50 of the Revised Code, motorcycle operator's license or endorsement, or the renewal or duplicate of any license or endorsement under Chapter 4506. or 4507. of the Revised Code, the registrar of motor vehicles or deputy registrar *shall ask* the applicant if he is eligible to register as an elector and, in addition, if he is registered. If the applicant replies that he is eligible but not registered, the registrar or deputy registrar shall offer to register him. If the applicant wishes to be registered, the registrar or deputy registrar shall register him and promptly send the completed registration forms to the board of elections of the county in which the applicant resides. The board shall file the registration forms in accordance with section 3503.13 of the Revised Code. *See* Am. Sub. H.B. 237, 118th Gen. Assemb., Reg. Sess. (Ohio 1989).

> is ineligible to register to vote.

Sub. H.B. 54, 136th Gen. Assemb., Reg. Sess. (Ohio 2025) (As Passed by the House).

The Ohio Senate took a different approach. Rather than create a new subsection within the motor voter statute, lawmakers amended it to read as follows: ... "When any person applies...and the person presents proof of United StatescCitizenship to the registrar of motor vehicles or the deputy registrar or has previously presented proof of United States citizenship to the registrar or any deputy registrar, the registrar or deputy registrar shall offer..." Am. Sub. H.B. 54, 136th Gen. Assemb., Reg. Sess. (Ohio 2025) (As Passed by the Senate). The House concurred with the Senate version, passing H.B. 54 as amended the same day. Am. Sub. H.B. 54, 136th Gen. Assemb., Reg. Sess. (Ohio 2025) (As Concurred by the House).

On March 31, 2025, Ohio Governor Mike DeWine signed H.B. 54 into law, and on June 30, 2025, the amended motor voter statute took effect. Accordingly, the current Ohio motor voter statute, § 3503.11, reads, in relevant part:

> When any person applies for a driver's license, commercial driver's license, a state of Ohio identification card, [...] or motorcycle operator's license or endorsement, or the renewal or duplicate of any license [...], *and the person presents proof of United States citizenship to the registrar of motor vehicles or the deputy registrar or has previously presented proof of United States citizenship to the registrar or any deputy registrar*, the registrar or deputy registrar shall offer the applicant the opportunity to register to vote or to update the applicant's voter registration by electronic means in conjunction with the person's transaction with the registrar or deputy registrar, in a manner prescribed by the secretary of state.

Ohio Rev. Code § 3503.11(A)(1) (as amended June 30, 2025) (emphasis added).

## B. Procedural Background

On August 22, 2025, Plaintiffs Red Wine & Blue and Ohio Alliance for Retired Americans

filed a three-count Complaint for Declaratory and Injunctive Relief (ECF No. 1) against Defendants Frank LaRose, in his official capacity as Ohio Secretary of State, and Charles L. Norman, in his official capacity as Ohio's Registrar of Motor Vehicles. Plaintiffs, two non-partisan civic engagement organizations, alleged that the documentary proof of citizenship language added to Ohio's motor voter statute through Ohio House Bill 54 imposes an unnecessary obstacle to register to vote at Ohio's Bureau of Motor Vehicles offices in violation of the National Voter Registration Act (Counts I and II), and is impermissibly vague in violation of the First and Fourteenth Amendments (Count III). (Compl. ¶ 11.)

On September 18, 2025, Defendants filed their Answer (ECF No. 14), as well as a Combined Motion to Dismiss and Partial Motion for Judgment on the Pleadings (ECF No. 15). In their Combined Motion, Defendants primarily argued that Plaintiffs lack Article III standing, and therefore the court should dismiss the action for lack of subject matter jurisdiction. Plaintiffs filed their Opposition to the Combined Motion (ECF No. 25) on October 20, 2025, to which Defendants filed their Reply in Support (ECF No. 26) on November 3, 2025.

While Defendants' Combined Motion was pending, the Republican National Committee ("RNC") filed a Motion to Intervene as a defendant. (ECF No. 17.) The court denied the RNC's Motion to Intervene on November 20, 2025. (Order, ECF No. 27.)

Then, on January 6, 2026, Defendants filed a Notice of Supplemental Authority regarding Senate Bill 293 ("S.B. 293"), which was signed into law on December 19, 2025. (Defs.' Not. of Supp. Auth., ECF No. 28.) S.B. 293 amended various parts of Title 35, including the definitions section. Relevant here is that S.B. 293 adds a definition of "proof of citizenship" to Ohio Revised Code § 3501.01. (*Id.* at PageID 309.) In their Notice, Defendants provided the full "proof of

citizenship" definition being added to Title 35, and indicated that they had asked Plaintiffs whether they would voluntarily dismiss their vagueness claim (Count III) and 52 U.S.C. § 20507(b)(1) claim (Count II) when S.B. 293 becomes effective March 20, 2026. (*Id.* at PageID 310.) Plaintiffs did not state their position on the Notice. (*Id.*)

On April 28, 2026, Plaintiffs filed the Motion for Preliminary Injunction (ECF No. 29) considered herein. In their Motion, Plaintiffs seek relief only as to Count I of their Complaint. Specifically, Plaintiffs argue that the court should enjoin H.B. 54's documentary proof of citizenship requirement before the October 5 voter registration deadline as it is preempted by the NVRA. (Mot. at PageID 362–63.) On May 13, 2026, Defendants moved to stay any preliminary injunction proceedings until the court ruled on its Combined Motion to Dismiss. (*See* ECF No. 32.) Plaintiffs opposed the stay on May 22, 2026 (ECF No. 33), and on May 27, 2026, the court denied Defendants' motion to stay and set forth an expedited briefing and hearing schedule on Plaintiffs' Preliminary Injunction Motion. (Order, ECF No. 34.)

Consistent with the court's expedited briefing schedule, Defendants filed their Opposition to Plaintiffs' Motion (ECF No. 25) on June 4, 2026. That same day, Honest Elections Project ("HEP") filed a Motion for Leave to File Brief of Amicus Curiae (ECF No. 38). The following day, June 5, 2026, the Republican National Committee filed a Motion for Leave to File Amicus Brief (ECF No. 39). The court granted the HEP and RNC Motions on June 5, 2026 (Order, ECF No. 42).

The next week, on June 11, 2026, Plaintiffs filed their Reply in Support of their Preliminary Injunction Motion (ECF No. 49). Also on June 11, 2026, the United States of America filed a Motion for Leave to File a Statement of Interest (ECF No. 50), and the America First Policy Institute filed a Motion for Leave to File an Amicus Brief (ECF No. 48). The court denied both Motions for

Leave on June 16, 2026 (Order, ECF No. 52).

On June 18, 2026, the parties filed a Joint Notice Regarding Hearing on Motion for Preliminary Injunction (ECF No. 53). In it, the parties "stipulated that, for purposes of the pending motion for preliminary injunction, the Court may consider the exhibits attached to the parties' briefing related to that motion, as well as any other exhibits in the record." (Not. at PageID 1580.) Defendants also stipulated to the authenticity of Plaintiffs' Exhibits 20 and 21 (ECF Nos. 49-1, 49-2), but they "reserve[d] their right to object at the hearing to these exhibits because they were offered for the first time in Plaintiffs' reply." (Not. at PageID 1581.)

The Preliminary Injunction Hearing was held June 25, 2026. Defendants objected to Plaintiffs Exhibits 20 and 21, but both were ultimately admitted as Defendants were permitted to cross-examine Margaret "Peggy" Dutcher (Pls.' Ex. 20 Declaration), and declined to cross-examine Gianina Fazio (Pls.' Ex. 21 Declaration) at a later time given her absence from the Hearing. (Tr. at PageID 1600–90; 1718–20.)

## III. LEGAL STANDARD

### A. Preliminary Injunction under Federal Rule of Civil Procedure 65

A preliminary injunction under Federal Rule of Civil Procedure 65 "is an extraordinary and drastic remedy." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). The moving party therefore must show that the circumstances clearly demand it. *Id.* Courts consider four factors when deciding whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the

public interest would be served by the issuance of an injunction." *Id.* (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). These factors apply in aggregate and must be balanced rather than treated as "prerequisites to be met." *Id.* But while no single factor is controlling, the first two—likelihood of success on the merits and irreparable harm—predominate the preliminary injunction analysis. *See O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015); *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020).

## IV. DISCUSSION

### A. Statutory Interpretation of Section 5 of the NVRA

The court begins its discussion by interpreting Section 5 of the NVRA. Like any issue of statutory interpretation, the court's inquiry starts with the text, "giving each word its ordinary, contemporary, common meaning." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (internal quotation marks omitted) (quoting *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997)). Where "the words of the statute are unambiguous, the judicial inquiry is complete." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (quotation and citation omitted). That said, "words that can have more than one meaning are given content, [], by their surroundings." *Inter Tribal*, 520 U.S. at 10. Moreover, the court must "presume that Congress 'says in a statute what it means and means in a statute what it says.'" *J. B-K. by E.B. v. Sec'y of Kentucky Cabinet for Health & Fam. Servs.*, 48 F.4th 721, 726 (6th Cir. 2022) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

Section 5 of the NVRA is titled: "Simultaneous application for voter registration and

application for motor vehicle driver's license[.]" 52 U.S.C. § 20504.[5] The provision's general command is that:

> Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

52 U.S.C. § 20504(a)(1). The parties principally dispute the meaning of "application submitted."

Plaintiffs contend a driver's license application is submitted when the applicant completes Column A of the BMV Form (Defs.' Ex. A 4) and hands it to the deputy registrar for processing. (Tr. at PageID 1698.)[6] This interpretation, Plaintiffs maintain, is consistent with the common understanding of the term: "an application is something that you submit, and you hope that you get what you submitted it for. [...] It's the nature of an application that it could be rejected, but it still is an application, and that application was submitted to the BMV." (*Id.* at PageID 1699–1700.) Plaintiffs also point to the dictionary definition of "application," stating that Merriam-Webster defines the word to include request, petition, or a form used in making a request. (*Id.* at PageID 1700.) Additionally, Plaintiffs contend that other sections of Ohio law confirm their interpretation, such as § 4507.06(a)(1), which says "every application for a driver's license shall be made upon the approved form furnished by the Registrar of Motor Vehicles" (Defs.' Ex. A 4), and § 4507.21(a),

---

[5] "Although section headings cannot limit the plain meaning of a statutory text, 'they supply cues' as to what Congress intended[.]" *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) (internal citation omitted) (quoting *Yates v. United States*, 574 U.S. 528, 540 (2015)).

[6] As Plaintiffs' counsel explained at the Hearing: "Someone goes to BMV. They take Defendant's Exhibit A 4, fill out part of it and literally hand it to the BMV. They can try to provide them with documents as well. They have submitted an application. They have applied." (Tr. at PageID 1698.)

which reads that "each applicant for a driver's license shall file an application in the Office of the Registrar, or of motor vehicles or of a deputy registrar." (*Id.* at 1701.)

Defendants counter by arguing that a driver's license application is submitted when the application is complete. The application is complete when Column A is filled in by the applicant and Column B is filled in by the deputy registrar based on the documents presented by the applicant to prove all five identify fields necessary to obtain an Ohio driver's license. (Tr. at PageID 1644.)[7] Defendants contend that this is the proper reading because State law dictates when a driver's license application is deemed submitted—an interpretation they argue flows from the phrase "under State law" in § 20504(a)(1). (*Id.* at PageID 1655.)

Looking solely at the text of the statute, the court is unpersuaded by Defendants' interpretation for a number of reasons. First, Defendants' reading essentially adds the word "complete" ahead of "driver's license application" in § 20504(a)(1). It is well-settled that a court "should resist reading words or elements into a statute that do not appear on its face." *Cnty. of Oakland v. Fed. Hous. Fin. Agency*, 716 F.3d 935, 940 (6th Cir. 2013) (internal quotation omitted) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004)). If Congress had intended that only a "complete" driver's license application "shall serve as an application for voter registration," it would have said so. For example, subsection (e) of Section 5 reads: "a *completed* voter registration portion of an application for a state motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted...not later than 10 days after the date of

---

[7] As Defense counsel stated at the Hearing: "It means that a driver's license application, it is neither completed nor submitted until both of these columns have been completed by the applicant and by the deputy registrar, and documents sufficient to establish all five fields of the identify fields have been presented." (Tr. at PageID 1644.)

acceptance." *See* § 20504(e)(1) (emphasis added).

Second, Defendants' interpretation rests on a flawed reading of § 20504(a)(1) as a whole. During the Hearing, Defendants maintained that the phrase "under State law" modified "driver's license application submitted:"

> I would point you to the very first clause of the statute we have been talking about...And what it says is that every driver's license application submitted to the BMV, and it then says, quote "under State law." That's really important here, [sic] is that we are looking at state law when we are talking about when a driver's license application is submitted.

(Tr. at PageID 1655.) However, this reading conflicts with the grammatical rule of the last antecedent, which says that "a limiting clause or phrase...should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Here, the limiting clause is "under State law," and the phrase it immediately follows is "appropriate State motor vehicle authority," not "driver's license application submitted." Thus, "under State law" explains to whom a driver's license application is submitted—not what "driver's license application submitted" means.

The rule of the last antecedent is not absolute, and it can be overcome by "other indicia of meaning[.]" *Barnhart*, 540 U.S. at 26. Indeed, it might be reasonable to apply "under State law" to "driver's license application submitted," since Section 5 only tells States what the voter registration application component may or must require:

> The voter registration application portion of an application for a State motor vehicle driver's license—
>
> > (A) may not require any information that duplicates information required in the driver's license portion of the form[;]

> (B) may require only the minimum amount of information necessary to–
>
> (i) prevent duplicate voter registrations; and
>
> (ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process; [and]
>
> (C) shall include a statement that–
>
> (i) states each eligibility requirement (including citizenship);
>
> (ii) contains an attestation that the applicant meets each such requirement; and
>
> (iii) requires the signature of the applicant, under penalty of perjury;

§ 20504(c)(2)(A)–(C). Even so, Defendants' interpretation that "application submitted" means only complete driver's license applications still tortures the ordinary meaning of a rather unambiguous phrase.

The NVRA does not define "application submitted" nor either word independently. When a statute's term is undefined, "'[t]he everyday understanding should count for a lot,' and we look to 'regular usage to see what Congress probably meant.'" *Cnty. of Oakland*, 716 F.3d at 940 (quoting *Lopez v. Gonzales*, 549 U.S. 47, 53 (2006)). As used in the NVRA, "application" refers to a voter registration application or a driver's license application. Thus, "application" is a noun that means a "request," "petition," or "a form used in making a request." *Application*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/application. This definition is consistent with one from the early 1990s when the NVRA was enacted. *See Application*, WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1994) (defining "application" as "a request for aid, employment, or admission[,]" or "the form or document for such a request.").

Given that an "application" is a request for something—be it a driver's license or to be added

to a State's voter rolls—it follows that someone must consider it and decide whether to grant or deny the request. Put simply, it must be "submitted," or "presented, sent, or handed in for the consideration, decision, or approval of others, as an application, proposal, report, etc." *Submitted*, Dictionary.com, https://dictionary.com/browse/submitted. *See also Submitted*, WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1994) ("to subject to a condition or process" or "to commit (something) to the consideration or judgment of another").

Accordingly, the everyday understanding of "application submitted" includes those driver's license applications submitted to the deputy registrar for consideration, regardless of the deputy registrar's decision to grant or reject the applicant's request. In other words, when Congress said "[e]ach State motor vehicle driver's license application submitted...shall serve as an application for voter registration," it meant even those driver's license applications rejected for failing to meet the state's licensing requirements.

This conclusion does not upset a State's authority to set its own licensing requirements and processes. On the contrary, it reflects Congress's decision to draft Section 5 in a way that permits the use of two forms:

> Section 5(c) is so drafted to describe an application process that permits the use of two forms, one for the motor vehicle driver's license application and one for the voting registration application, thereby avoiding any cost associated with revamping current procedures or computer programs ...Where two forms are used, it is expected and intended that such forms will be used simultaneously as part of a single, integrated application process. All applicants appearing at the motor vehicle office must be given an application that includes both forms.

H. REP. NO. 103-9, at 9; S. REP. NO. 103-6, at 25. Moreover, adopting Defendants' interpretation would allow states whose driver's licenses requirements are more onerous than their voter

registration requirements to skirt the NVRA's command that the voter registration portion of a driver's license application require "only the minimum amount of information necessary." § 20504(c)(2)(B)(ii). Such an outcome could almost obliterate the whole purpose of the NVRA.

Therefore, the court finds that "application submitted" as used in Section 5 of the NVRA includes all driver's license applications submitted to a State's motor vehicle authority, regardless of the application's success or failure. The court now evaluates Ohio's BMV voter registration process against Section 5's text.

**B. Ohio's Motor Voter Process**

Ohio law provides that, "[w]hen any person applies for a driver's license [...], and the person presents proof of United States citizenship to the registrar of motor vehicles or the deputy registrar or has previously presented proof of United States citizenship to the registrar or any deputy registrar, the registrar or deputy registrar shall offer the applicant the opportunity to register to vote [...]." § 3503.11(a)(1). To understand how this law works in practice, the court turns to Ohio's driver's license application process.

Under Ohio law, all persons seeking an Ohio driver's license for the first time must apply in person at the deputy registrar's office, *i.e.*, the BMV.[8] (King Decl. ¶ 11, ECF No. 35-1.) Pursuant

---

[8] The court's discussion focuses on Ohio's driver's license application process for those seeking an Ohio credential in the first instance. License renewals are handled somewhat differently when the applicant seeks to renew the license either before it expires, or within six months of it expiring. (*See* King Decl. ¶¶ 28–34.) When an applicant seeks to renew his or her license before it expires or within six months of it expiring, the applicant is "eligible for a one-document transaction...mean[ing] that the applicant does not need to present documents sufficient to establish each of the 'five fields.' (*Id.* ¶ 29.) This one-document renewal process can only be used by citizens. (*Id.*)

However, people who seek to renew their driver's license after the 6-month

to Ohio Revised Code § 4507.06(A), "[e]very application for a driver's license...shall be made upon the approved form furnished by the registrar of motor vehicles and shall be signed by the applicant." The application must state the following: "[t]he applicant's name, date of birth, social security number if such has been assigned, sex, general description, including height, weight, color of hair, and eyes, residence address, including county of residence, duration of residence in this state, and country of citizenship[.]" Additionally, all applicants applying in-person at a deputy registrar office "shall be photographed at the time the application for the license is made [and] [t]he application shall state any additional information that the registrar requires." § 4507.06 (A)(2).

The registrar-approved application form is BMV Form 5745 ("BMV Form"), and it has two columns: Column A and Column B.[9] (King Decl. ¶ 11, Defs.' Ex. A 4 at PageID 1217.) Column A contains blank spaces in which the applicant writes his or her first name, full middle name, current last name, suffix, residence address, apt/unit #, city, state, zip, date of birth, sex, Social Security number, height, weight, hair color, eye color, telephone number, and e-mail address. (Defs.' Ex. A 4 at PageID 1217.) The applicant must also check a box indicating his or her legal presence in the United States, specifically as either a U.S. citizen, U.S. national (non-U.S. citizen), permanent resident (non-U.S. citizen), or temporary resident (non-U.S. citizen). At the bottom of the BMV Form is the following statement: "Warning: It is a criminal offense to give false information on this

---

expiration date must apply in person at the BMV and present documents proving the "five fields" as they would to obtain a license in the first instance. *See* Ohio Admin. Code § 4501:1-1-21(C) ("A person who applies for first issuance of an Ohio credential, or issuance when an Ohio credential has been expired for more than six months shall present identification documents...").

9 Ohio offers standard and Real ID-compliant licenses. BMV Form 5745 includes application forms for both. Column A seeks the same information from the applicant on both. (Defs.' Ex. A 4.)

application. Under penalty of law, I affirm that the above information is true to the best of my knowledge and belief." (*Id.*) After the warning, the form provides a signature box for the applicant. The applicant's signature "[m]ust be signed in front of the processing employee." (*Id.*)

Once an applicant fills out Column A, he or she presents the BMV Form to the deputy registrar along with documents establishing the applicant's identity. (King Decl. ¶ 12.) The deputy registrar then processes the application using an electronic point-of-sale system called BASS. (*Id.* ¶ 3.) The BASS system presents various prompts to the deputy registrar and the applicant during the application processing phase. (Tr. at PageID 1642.) The first set of prompts pertains to the identity confirmation portion of the application, or Column B of the BMV Form. (*Id.*)

At the top of Column B, the BMV Form reads: "Applicants must present documents to prove the 5 elements. If applying for a duplicate or renewal, one document is acceptable when all conditions are met." (Defs.' Ex. A 4; King Decl. ¶ 8.) The BMV Form then lists a series of check boxes in which the deputy registrar marks the type of document the applicant presented to prove each of the five elements. (Defs.' Ex. A 4; Tr. at PageID 1644.) The five elements are: full legal name, date of birth, Social Security number, street address of the person's principal residence in Ohio, and the applicant's status as a citizen, permanent resident, or temporary resident of the U.S. (King Decl. ¶ 8.) Acceptable documents for proving each of these fields is provided by BMV regulations. *See* Ohio Admin. Code § 4501:1-1-21.

For example, if the applicant presents a U.S. passport, the deputy registrar will enter the document number into the BASS system, which then checks the number against the Department of Homeland Security's SAVE database. (King Decl. ¶ 12.) Additionally, the deputy registrar marks on the BMV Form the type of document presented to prove the applicant's legal presence, and

designates in the BASS system the applicant's citizenship status and document presented. (*Id*. ¶¶ 12, 14; Tr. at PageID 1644.) The process of checking boxes on the BMV Form continues until all five identity fields are proven by the applicant's presentation of acceptable documents.

Once all identity fields are proven, and the applicant has been marked as a U.S. citizen in the BASS system, the BASS system will prompt the deputy registrar to ask the applicant whether he or she wants to apply to register to vote or update his or her registration. (Tr. at PageID 1647–48; King Decl. ¶ 21.) The applicant then responds yes or no, and the BASS system displays to the applicant his or her response. (*Id.*) If the applicant said "yes," the BASS system displays to the applicant this affirmation: "I declare under penalty of election falsification I am a citizen of the United States, will have lived in the state for 30 days immediately preceding the next election, and will be at least 18 years of age at the time of the general election." (King Decl. ¶ 21.) After the applicant so affirms, "the deputy registrar transmits the voter registration to the Secretary of State for further distribution to the boards of elections. No voter registration form is printed." (*Id.*; *see also* Tr. at PageID 1648.)

If an applicant does not present documentation proving all of the identity fields, then the application is rejected, and none of the applicant's information is saved in the BASS system. (King Decl. ¶ 15; Tr. at PageID 1644–45.) As a result, the BASS system does not prompt the deputy registrar to offer the driver's license applicant the opportunity to register to vote. (Tr. at PageID 1649.)

For those driver's license applicants whose applications are not approved, deputy registrars *may* offer them a paper voter registration form, or the unsuccessful driver's license applicant can ask the deputy registrar for a voter registration form. (King Decl. ¶ 25.) But in no instance does Ohio require deputy registrars to proactively offer an unsuccessful driver's license applicant the

opportunity to fill out a voter registration application. (Tr. at PageID 1649–50.)

This process, as described by Sydney King, Chief Policy Advisor in the BMV, and presented by Defendants at the Hearing, does not appear to comport with Section 5 of the NVRA. As previously determined, a driver's license application is submitted under Section 5 of the NVRA when the applicant presents a BMV Form with Column A filled out to the deputy registrar. It is at that moment that Section 5 requires Ohio to affirmatively offer the driver's license applicant the opportunity to register to vote, unless, of course, the applicant has indicated on the BMV Form that he or she is a noncitizen. Currently, however, Ohio's motor voter application process only requires deputy registrars to affirmatively offer voter registration applications to those driver's license applicants who ultimately obtain an Ohio driver's license because they satisfied all of Ohio's credentialing requirements—one of which is documentary proof of citizenship.

Accordingly, Ohio's process for voter registration in conjunction with a driver's license transaction is inconsistent with Section 5's general command that "[e]ach State motor vehicle driver's license application [...] submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration[.]" § 20504(a)(1).

Having determined that Ohio's process for registering voters at the BMV does not comply with § 20504(a)(1), the court turns to the preliminary injunction analysis for whether § 3503.11, as amended by House Bill 54, violates § 20504(c) of the NVRA because it requires more than the "minimum amount of information necessary to [...] (ii) enable State election officials to assess the eligibility of the applicant[.]" § 20504(c)(2)(B).

## C. Preliminary Injunction Factors

### *1. Likelihood of Success on the Merits*

The first preliminary injunction factor is whether Plaintiffs have a strong likelihood of success on the merits. A necessary part of this analysis is whether Plaintiffs have shown, through evidence, that they are likely to establish each element of Article III standing. Thus, the court discusses standing first.

a. Standing

Under Article III of the U.S. Constitution, standing is a threshold requirement for a court to hear all cases and controversies, and thus implicates the issue of subject matter jurisdiction. *See Horne v. Flores*, 129 S.Ct. 2579, 2592 (2009); *Flast v. Cohen*, 392 U.S. 83, 94–95 (1968). The burden of demonstrating Article III standing is on the party invoking federal jurisdiction. *Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008). The plaintiff "must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Furthermore, courts "determine whether standing exists at the time of the filing of the complaint." *Graveline v. Benson*, 992 F.3d 524, 532 (6th Cir. 2021) (internal quotations omitted) (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 524–26 (6th Cir. 2001)). When analyzing standing at the pleadings stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," because on a motion to dismiss, the court "preume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations omitted) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). However, at the preliminary injunction stage, a "plaintiff must make a clear showing through evidence that she is likely to establish each element of standing." *Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 509 (6th Cir. 2025) (internal quotations omitted) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)).

When the plaintiff is an organization, as Plaintiffs are here, it may demonstrate standing in two ways: (1) associational standing, where it sues on behalf of its members, and (2) organizational standing, where it sues on its own behalf. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378 (6th Cir. 2020).

Associational standing is a doctrine that "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986). An organization has associational standing to sue on behalf of its members if, "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Dayton Area Chamber of Com. v. Kennedy*, 147 F.4th 626, 632 (6th Cir. 2025) (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

To satisfy the first element of associational standing, Plaintiffs must show that a named member "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (internal quotations omitted) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

Defendants argue Plaintiffs cannot satisfy the first element for associational standing because their identified members do not have standing to sue in their own right. (Opp'n at PageID 1120–22.) Specifically, Defendants contend that RWB's members' alleged injuries are merely moral objections to H.B. 54, and "ideological disagreement is not a valid injury." (*Id.* at PageID 1120) (citing *FDA*

*v. All. For Hippocratic Medicine*, 602 U.S. 367, 381 (2024)). Plaintiffs defend their members' alleged injuries, arguing that the injury is not "moral opposition," but that H.B. 54 makes their members take an action they do not wish to take, namely producing a citizenship document before registering to vote. (Reply at PageID 1526.) Furthermore, when Plaintiffs' members did visit the BMV to obtain a driver's license and register to vote, they were denied the opportunity to do either for lack of sufficient documents. (*Id.* at PageID 1527; *see also* Pls.' Exs. 20–21.)

Plaintiff RWB identifies two members who, it argues, have standing to sue in their own right: Margaret "Peggy" Dutcher and Gianina Fazio.[10] Both women are U.S. citizens and became residents of Ohio in 2025. (Compl. ¶¶ 29–30; Dutcher Decl. ¶¶ 1, 4, ECF No. 49-1; Fazio Decl. ¶¶ 1, 4, ECF No. 49-2.) When the Complaint was filed on August 22, 2025, both alleged that they intended to visit the BMV soon to obtain new driver's licenses and register to vote. (Compl. ¶¶ 29–30.) At that time, Ms. Dutcher alleged that she would be injured by H.B. 54 because it "makes it necessary for [her] to locate and produce proof of citizenship to register to vote at the BMV, which she does not want to do." (*Id.* ¶ 29.) Similarly, Ms. Fazio claimed that "[b]ecause of HB 54, [she] will be required to obtain, locate, and produce proof of citizenship to register to vote at the BMV, including documents linking her new legal name to her citizenship documents. [She] does not wish to do so[.]" (*Id.* ¶ 30.)

In September 2025, Ms. Dutcher and her husband went to the BMV to attempt to obtain Ohio driver's licenses and register to vote. (Dutcher Decl. ¶ 8, ECF No. 49-1.) Prior to their visit, Ms. Dutcher's husband looked up the documents he believed were required to obtain an Ohio driver's license, and they gathered the relevant documents to bring with them to the BMV. (*Id.* ¶ 10.) Ms.

---

[10] Ms. Fazio was identified in the Complaint as Gianina Borgerson. (Compl. ¶ 30.) Between the Complaint's filing and Plaintiffs Motion for Preliminary Injunction, Ms. Fazio changed her name. (Pls.' Ex. 21.)

Dutcher recalls bringing her U.S. passport, her California driver's license (a Real ID), two utility bills, and a Social Security card reflecting her prior name. (*Id.*)

When they arrived, Ms. Dutcher's husband checked them in at an electronic kiosk using his name. (*Id.* ¶ 9.) Ms. Dutcher did not independently enter her's. (*Id.*) The BMV employee called Ms. Dutcher's husband's name, and the two went up to the counter together to speak with the BMV employee about obtaining driver's licenses and registering to vote. (*Id.*)

After presenting their documents to the BMV employee, the BMV employee informed them that the documents provided were insufficient to obtain a driver's license. (*Id.* ¶ 10.) As to Ms. Dutcher, the BMV employee did not permit her to obtain a driver's license because her Social Security card did not reflect her current name and her proof of residence was insufficient. (*Id.* ¶ 14.) Ms. Dutcher told the BMV employee that she wanted to be able to vote by the next election, and she was worried that she would not have time to register beforehand. (*Id.* ¶ 15.) The BMV employee told Ms. Dutcher that "when [she] returned with all documents necessary to obtain an Ohio driver's license, he would submit [her] voter registration information at that time." (*Id.*) Ms. Dutcher declares that the BMV employee "was clear that he would not register [her] to vote until [she] brought all documents necessary to obtain an Ohio driver's license." (*Id.*) The BMV employee also did not mention any other means by which Ms. Dutcher could register to vote. (*Id.*) Consequently, Ms. Dutcher "left with the impression that [she] would not be able to register to vote in Ohio by any means until [she] was able to obtain an Ohio driver's license." (*Id.*)

Before returning to the BMV to attempt to obtain an Ohio driver's license again, Ms. Dutcher discovered that she did have a Social Security card reflecting her current name. (*Id.* ¶ 17.) She brought this card with her, along with her passport and additional documents to prove her Ohio

residence when she visited the BMV again in late September 2025. (*Id.* ¶ 18.) On that second visit, Ms. Dutcher and her husband both successfully obtained driver's licenses and registered to vote. (*Id.*)

Ms. Dutcher declared that she "strongly believe[s] that Ohio should not require citizens to produce a passport or other document to prove their citizenship before they are allowed to register to vote—which [she] believe[s] creates unnecessary obstacles to voting." (*Id.* ¶ 19.) Ms. Dutcher registered on her second visit, however, because "[she] did not want to allow such a law to prevent [her] from registering to vote and ultimately making [her] voice heard at the ballot box." (*Id.*)

During the Hearing, Defense counsel asked whether Ms. Dutcher filled out a form during her first BMV visit. (*See* Tr. at PageID 1605–07.) Ms. Dutcher testified that she did not specifically recall filling out a form to obtain her driver's license. (*Id.* at PageID 1606.) When asked if the BMV employee took a filled out form from her, Ms. Dutcher replied, "I'm sure he did. To tell you the truth, I honestly don't remember any form...I really don't. I am sure we did fill out forms, but I honesty do not remember them." (*Id.* at PageID 1606–07.) Defense counsel also asked Ms. Dutcher what the basis was for her statement that Ohio requires a passport or citizenship document to register to vote. (*Id.* at PageID 1608–09.) Ms. Dutcher replied, "[b]ecause I was told I could not do that at the BMV. I did not have the proper identification to register to vote or to get my driver's license for that matter." (*Id.* at PageID 1609.)

Like Ms. Dutcher, Ms. Fazio was also denied the opportunity to register to vote at the BMV when she was unable to obtain a driver's license for lack of sufficient documents. Shortly after Ms. Fazio moved back to Ohio, she filled out a voter registration form at a farmer's market and successfully registered to vote under her former name, Gianina Borgerson. (Fazio Decl. ¶ 5, ECF No. 49-2.) She did not have to submit documentary proof of citizenship to fill out the voter registration

application at that time. (*Id.*) Ms. Borgerson became Ms. Fazio in late 2025. (*Id.* ¶ 6.) Because of her name change, Ms. Fazio needed to update her driver's license and voter registration to reflect her new name, both of which she attempted to accomplish at the BMV. (*Id.*)

When Ms. Fazio first visited the BMV, she believed she had all the necessary documents to obtain a driver's license. (*Id.* ¶ 7.) However, the BMV employee told her that she would not be able to obtain a license that visit because she lacked a birth certificate and a Social Security card reflecting her new name. (*Id.*) As a result, the BMV did not allow Ms. Fazio to obtain a driver's license or register to vote as part of that process that day. (*Id.*) Ms. Fazio estimates that she spent at least one hour at the BMV on her first visit. (*Id.* ¶ 8.)

After leaving the BMV, Ms. Fazio began requesting the documents she was told were necessary. (*Id.* ¶ 9.) She first obtained a birth certificate, which she then used as part of her application for a Social Security card reflecting her new name. (*Id.*) She received both documents after several weeks and then returned to the BMV at which point she was able to obtain her driver's license. (*Id.*) To the best of Ms. Fazio's recollection, she also updated her voter registration during that visit. (*Id.*) Ms. Fazio declared that "[h]ad [she] initially gone to the BMV shortly before the voter registration deadline, [she] would not have had time to gather the documents necessary to successfully apply for a driver's license before that deadline." (*Id.* ¶ 10.) Ms. Fazio estimates that she spent approximately two hours at the BMV during her second visit, and that it took her a total of 15 or more hours to ultimately obtain her driver's license. (*Id.* ¶¶ 11–12.)

Similar to Ms. Dutcher, Ms. Fazio declared that she "strongly believe[s] that Ohio should not require citizens to produce a passport, birth certificate, or other document to prove citizenship before being allowed to register to vote." (*Id.* ¶ 13.) Furthermore, Ms. Fazio believes it "creates unnecessary

obstacles to voting [and that] [r]egistering to vote at the BMV should be simpler than [her] experience was." (*Id.*) Because it was very important to her that she be able to vote, Ms. Fazio "would not allow a law requiring her to produce proof of citizenship to prevent [her] from registering to vote and voting." (*Id.*)

First, as to Ms. Dutcher's and Ms. Fazio's statements in the Complaint that H.B. 54 harms them because it requires them to take an action they do not want to take, *i.e.*, producing documentary proof of citizenship, the court finds persuasive the Tenth Circuit's conclusion that requiring a Kansas resident to provide DPOC to register to vote is sufficient to establish standing. *See Fish v. Schwab*, 957 F.3d 1105, 1120 (10th Cir. 2020) ("*Fish II*"). In *Fish II*, the state of Kansas argued that a plaintiff who possessed DPOC but did not bring it with him when he attempted to register to vote because he did not agree with Kansas's law requiring DPOC to register to vote, did not have standing to sue because his injury was self-inflicted. *Id. Fish II* rejected that argument, concluding that "Kansas's denial of Mr. Bednasek's application to register to vote for lack of DPOC functions analogously to the voter-identification law" in *ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008). The *Santillanes* court determined that plaintiffs who intended to vote in future elections and would have to present identification to vote had standing, despite none of them lacking the required photo identification. 546 F.3d at 1319. The Eleventh Circuit similarly reasoned in *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009), that "requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing."

More recently, a New Hampshire District Court found that, "[t]he requirement that the [plaintiffs] must produce documentary evidence to register to vote itself constitutes an injury

sufficient to confer standing." *N.H. Youth Movement v. Scanlan*, No. 24-CV-291-SE, — F. Supp. 3d —, 2026 WL 1500857, at *27 (D.N.H. May 28, 2026). As such, *Scanlan* concluded that the two minor U.S. citizens who would turn 18 by the end of 2026 and intended to register to vote as soon as they were eligible had standing to challenge a law requiring them to produce DPOC. *Id. See c.f.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025), *judgment entered*, No. 25-CV-0946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026), and *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026), and *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026) (finding associational standing where organization could produce a member's declaration that they are eligible to vote but would have difficulty complying with a DPOC requirement for the Federal Voter Registration From).

The Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024), does not alter the court's conclusion. There, the Court held that the plaintiffs, pro-life doctors and medical associations, lacked associational and organizational standing to challenge the FDA's actions regarding the regulation of mifepristone. 602 U.S. at 396–97. The doctors, who did not prescribe or use mifepristone, claimed to have "sincere legal, moral, ideological, and policy objections to mifepristone being prescribed and used by *others*," and that the FDA's actions injured them by causing conscious and downstream economic injuries. *Id.* at 386 (emphasis in the original). The Court rejected these causation theories, and reiterated that citizens may not sue "merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action." *Id.* at 381, 393. Thus, the doctors lacked standing to challenge the FDA's regulation of others. *Id.* at 392–93.

Here, while Plaintiffs RWB and the Alliance are not directly regulated by Ohio's motor voter

law, as amended by H.B. 54, Ms. Dutcher and Ms. Fazio are. As written, § 3503.11 requires them to produce documentary proof of citizenship before being offered the opportunity to register to vote as part of their driver's license transaction. Defendants resist this interpretation of § 3503.11, arguing that Ohio law "obliges deputy registrars to offer applicants for Ohio credentials the opportunity to register to vote if the applicant presents DPOC or has previously done so[,]" but "there is no corresponding prohibition[.]" (Opp'n at PageID 1123.) If it was a statute of prohibition, Defendants continue, then it would "include some sort of language of prohibition like 'BMV shall not register someone, shall not offer' or 'BMV shall only register certain people with certain qualifications.'" (Tr. at PageID 1662.)

Defendants correctly assert that the statute does not prohibit deputy registrars from offering voter registration to driver's license applicants who do not present proof of citizenship. Even so, the law only guarantees applicants are proactively offered the opportunity to register to vote if they first present proof of citizenship. The following syllogism underscores this outcome.

When any person applies for a driver's license (A) and presents documentary proof of citizenship (B), then the deputy registrar shall offer the opportunity to register to vote (C). Simply stated, if A *and* B, then C. But when any person applies for a driver's license (A), but does not present documentary proof of citizenship (B), then maybe the deputy registrar will offer the driver's license applicant the opportunity to register to vote (C). In other words, if A but not B, then maybe C.

Under this logical interpretation, the statute essentially authorizes deputy registrars to not offer voter registration to someone who fails to provide proof of citizenship. And "that itself," as Plaintiffs argue, "is a documentary proof of citizenship requirement." (Tr. at PageID 1620.) Therefore, the court finds that the proof of citizenship clause added to § 3503.11 by H.B. 54 is a

documentary proof of citizenship requirement.[11]

Applying this interpretation to Ms. Fazio's experience at the BMV, her injury is even more evident. During her first BMV visit, the BMV employee did not allow Ms. Fazio to obtain a driver's license for lack of required documents, including a birth certificate. (Fazio Decl. ¶ 7.) A birth certificate is an acceptable proof of citizenship document. *See* Ohio Rev. Code § 3501.01(EE)(1)(c). Because Ms. Fazio did not present DPOC, the deputy registrar was under no obligation to offer voter registration. And in fact, the deputy registrar did not offer Ms. Fazio the opportunity to register to vote. (Fazio Decl. ¶ 7.)

Accordingly, Plaintiffs have demonstrated through evidence that Ms. Fazio is likely to establish each element of standing to sue in her own right. First, she suffered an injury in fact by being required to produce DPOC to register to vote at the BMV, and by being denied the opportunity to register when she did not present DPOC. Second, that DPOC requirement and denial is traceable to H.B. 54 because that is the legislation that added the proof of citizenship clause to § 3503.11. Finally, the injury is likely to be redressed by an injunction of this court because it would prevent Defendants from enforcing the DPOC requirement against driver's license applicants who do not present DPOC, thereby ensuring driver's license applicants are offered the opportunity to register to vote, despite lacking necessary driver's license documents.

With regard to Ms. Dutcher, the record shows that she did present acceptable DPOC, *i.e.,* a

---

[11] Further supporting this interpretation is the Ohio Legislative Service Commission's final summary of H.B. 54. There, the Commission described the act as "requir[ing] the Registrar or a deputy registrar to offer voter registration to a customer only if (1) the customer presents proof of U.S. citizenship to the Registrar or deputy registrar or (2) the customer has previously presented proof of U.S. citizenship to the Registrar or any deputy registrar." OHIO LEGIS. SERV. COMM'N, H.B. 54 FINAL ANALYSIS, 136th Gen. Assemb., Reg. Sess., at 33 (2025).

current U. S. Passport (§ 3501.01(EE)(1)(d)). (Dutcher Decl. ¶ 10.) Even so, the deputy registrar refused to offer her an opportunity to register to vote because her driver's license application was unsuccessful. (*Id.* ¶ 15) ("he would not register me to vote until I brought all documents necessary to obtain an Ohio driver's license."). However, the NVRA obligates States to offer the opportunity to register to vote regardless of whether the driver's license applicant successfully obtains a license. (*See* supra discussion at § IV.A.) And as Defendants' King Declaration and Hearing testimony, and Ms. Dutcher's actual BMV experience shows, Ohio's process for offering voter registration simultaneous with a driver's license application conflicts with Section 5 of the NVRA. Therefore, the court finds that Plaintiff Red Wine & Blue has established the first element of associational standing because its identified members have standing to sue in their own right.

The remaining elements also exist, and Defendants do not challenge associational standing on these grounds. RWB seeks to protect its members' ability to register to vote, or update their registration, at the BMV without having to present documentary proof of citizenship. (Compl. ¶ 23; Mullen Decl. ¶ 11, ECF No. 29-2.) These interests are germane to RWB's core mission of "encouraging its members to vote, to be politically engaged, and to organize their communities to be politically engaged." (Compl. ¶ 22; *see also* Mullen Decl. ¶ 5.) To vote in Ohio, eligible citizens must be registered. Thus, RWB's pursuit of injunctive relief to prevent Defendants from enforcing H.B. 54 against its members seeking to register to vote at the BMV strikes at the core of RWB's mission. Furthermore, neither RWB's claims nor the relief requested requires Ms. Dutcher or Ms. Fazio's participation in the lawsuit.

As a result, the court finds that Plaintiff RWB has, through evidence, shown that it is likely to establish each element of associational standing. Additionally, since the court concludes that RWB

has associational standing, it need not decide whether the Ohio Alliance for Retired Americans has standing "because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n. 2 (2006). *See also Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 555 (6th Cir. 2021) ("If one party has standing, then identical claims brought by other parties to the same lawsuit are also justiciable.") RWB and the Alliance bring identical claims. Thus, the court confines its standing analysis to RWB.

b. Mootness

The court also finds that Plaintiffs' claims are not moot even though RWB's members have since registered to vote in conjunction with their driver's license transactions at the Ohio BMV. A case is moot, thereby depriving the court of jurisdiction, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Lawrence v. Blackwell*, 430 F.3d 368, 370 (6th Cir. 2005) (internal quotation marks omitted) (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)). An exception to the mootness doctrine exists for wrongs that are "capable of repetition, yet evading review." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006) (quoting *Rosen v. Brown*, 970 F.2d 169, 173 (6th Cir. 1992)). Courts apply this exception when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Blackwell*, 430 F.3d at 371 (internal quotation marks omitted) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Whichever party argues the exception bears the burden to establish both prongs. *Blackwell*, 430 F.3d at 371.

Generally, the first prong is satisfied when the legal dispute involves election laws because

"litigation has only a few months before the remedy sought is rendered impossible by the occurrence of the relevant election." *Id.* In *Blackwell*, an election law case, the Sixth Circuit concluded that the plaintiffs satisfied the first prong easily, despite the occurrence of the 2004 election making it impossible for the courts to grant the relief requested, which was placing the plaintiff's name on the ballot. *Id.* Likewise here, the lawsuit concerns Ohio's voter registration laws, which are inherently election laws. Thus, as in *Blackwell*, the court finds Plaintiffs satisfy the first prong of the mootness exception.

The second prong, whether the challenged action is capable of repetition, is somewhat trickier. Because Ms. Fazio and Ms. Dutcher did successfully obtain Ohio driver's licenses, they have presented DPOC to the deputy registrar. Since BMV records reflect that proof of legal presence, H.B. 54 is unlikely to prevent them from updating their voter registration or re-registering during another driver's license transaction. *See* § 3503.11(A)(1) ("or has previously presented proof of United States citizenship to the registrar or any deputy registrar[.]") That said, "the fact that the controversy almost invariably will recur" with respect to some future Ohio resident seeking to register to vote in conjunction with their driver's license application, "is sufficient to meet the second prong because it is somewhat relaxed in election cases." *Blackwell*, 430 F.3d at 372. Indeed, courts have found this second prong satisfied to hear challenges to election laws "even when the nature of the law made it clear that the plaintiff would not suffer the same harm in the future." *Id.* (citing *Rosario v. Rockefeller*, 410 U.S. 752, 756 n.5 (1973)); *Dunn v. Blumstein*, 405 U.S. 330, 333 n.2 (1972)). Therefore, because the harm Plaintiffs allege resulted from a current Ohio election law, future Ohioans will suffer the same harm Plaintiffs allege. As such, the court finds that the capable of repetition yet evading review exception to mootness does apply, and the court can properly

exercise jurisdiction.[12]

For the foregoing reasons, the court finds that Plaintiffs have associational standing to seek injunctive relief, and that their claim is not moot in light of RWB's members successfully registering to vote. Because Plaintiffs have associational standing, the court declines to examine organizational standing.

c. Conflict with Section 5's Minimum Amount Necessary Provision

The court finally determines whether Ohio's proof of citizenship requirement to register to vote simultaneously with a driver's license application conflicts with the NVRA and is therefore preempted.

Section 20504(c) prescribes the forms and procedures for implementing the NVRA's mandate that, "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration." § 20504(a). Specifically, the provision dictates what the voter registration application portion of the driver's license application "may not require" and "may require," § 20504(c)(2)(A)–(B), as well as what it "shall include." § 20504(c)(2)(C)–(D).

Relevant here are subsections (2)(B) and (2)(C), which read:

> (2) the voter registration application portion of an application for a State motor vehicle driver's license–

---

12 During the Hearing, Plaintiffs also noted that if registering to vote mooted an eligible Ohio citizen's claim that the State's motor voter statute violates the NVRA, then that citizen would have to refrain from registering to vote, and therefore voting, until the case was complete. (Tr. at PageID 1695–96.) A mootness rule essentially requiring a citizen to give up their right to vote to challenge an allegedly unlawful voting restriction is unreasonable and contrary to the well-established principle that "[t]he right to vote is fundamental, as it is "preservative of all rights." *Yick Wo*, 118 U.S. at 370 (1886).

> (B) may require only the minimum amount of information necessary to–
>
> > (i) prevent duplicate voter registrations; and
> >
> > (ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;
>
> (C) shall include a statement that–
>
> > (i) states each eligibility requirement (including citizenship);
> >
> > (ii) contains an attestation that the applicant meets each such requirement; and
> >
> > (iii) requires the signature of the applicant, under penalty of perjury;

§ 20504(c)(2)(B)–(C). Plaintiffs read these subsections together to argue that the NVRA presumptively prohibits states from requiring more than a sworn attestation to prove citizenship. (Mot. at PageID 367.) Given that interpretation, Plaintiffs contend that Ohio's documentary proof of citizenship requirement for registering to vote simultaneously with a driver's license application is more than the presumptive minimum. (*Id.* at PageID 370–72.) That presumptive minimum can be rebutted, Plaintiffs continue, if Defendants show that a substantial number of noncitizens have successfully registered to vote notwithstanding the attestation requirement. (*Id.*) However, Defendants cannot make that showing, and so Ohio's documentary proof of citizenship requirement conflicts with the NVRA and is preempted. (*Id.*)

Plaintiffs' position follows the legal framework established in *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ("*Fish I*"). There, the plaintiffs challenged Kansas's DPOC voter registration

requirement as applied to the federally-mandated voter registration section of state driver's license applications. 840 F.3d at 715. *Fish I* affirmed the district court's preliminary injunction order finding the plaintiffs made a strong showing that Section 5 of the NVRA preempted Kansas's DPOC law because it was more than the "minimum amount of information necessary." *Id.* at 716.

To reach this conclusion, *Fish I* conducted a thorough statutory analysis of Section 5, specifically the "minimum amount of information necessary" subparagraph and the provision's mandate that applications list voter qualifications and require applicants to attest to the truth of the information provided under penalty of perjury. 840 F.3d at 734–37. The circuit court determined that the attestation requirement "cannot contravene or overstep the minimum-information principle," but acknowledged that it may not be sufficient in every case for a state to carry out its eligibility-assessment duties. *Id.* at 737. Thus, the attestation requirement was a *presumptive* minimum amount of information necessary, and Section 5 permitted states to rebut that presumption by making a factual showing as to the attestation requirement's insufficiency. *Id.* at 738.

*Fish I* likened its rebuttable presumption interpretation to that of the Supreme Court's interpretation of Section 9 in *Arizona v. InterTribal*, 520 U.S. 1 (2013). There, the Supreme Court held that Section 9 of the NVRA precluded Arizona from requiring Federal Form applicants to submit information, such as documentary proof of citizenship, beyond that required by the form itself. 570 U.S. at 20. Arizona argued the Court's interpretation would result in a conflict between the NVRA and Arizona's constitutional authority to establish qualifications, such as citizenship, for voting. *Id.* at 16. *Inter Tribal* recognized Arizona's concern, stating that, "it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." *Id.* at 17. But, the Court determined that its interpretation did not

upset Arizona's ability to request that the Election Assistance Commission edit the Federal Form to include information the State deems necessary to determine eligibility. *Id.* at 18–19 ("Since, pursuant to the Government's concession, a State may request that the EAC alter the Federal Form...no constitutional doubt is raised by giving the 'accept and use' provision of the NVRA its fairest reading.") Thus, like a State's ability to request changes to the Federal Form, *Fish I* found that Section 5 "provides an escape valve," thereby leaving open a State's ability to require more than attestation. 840 F.3d at 742.

*Fish I* further explained that a State may trigger Section 5's escape valve and require more than attestation of citizenship if it shows "that a substantial number of noncitizens have successfully registered to vote under the attestation requirement." *Id.* The court reasoned that,

> it cannot be that, while intending to create a simplified form of registration for federal elections, Congress adopted such a malleable statutory principle (i.e., minimum information) that the states could effectively become the final arbiters of what is required under the NVRA by the simple expedient of claiming that one noncitizen managed to register to vote. Congress adopted the NVRA to ensure that whatever else the states do, "simple means of registering to vote in federal elections will be available." *Inter Tribal*, 133 S.Ct. at 2255. This purpose would be thwarted if a single noncitizen's registration would be sufficient to cause the rejection of the attestation regime.

840 F.3d at 748. Accordingly, the Tenth Circuit affirmed the district court's grant of preliminary injunction.

Defendants vehemently oppose applying the legal framework endorsed in *Fish I* to this case. First, they distinguish Kansas's DPOC law from Ohio's because it applied to all forms of voter registration, and included prohibitory language, like "shall not be registered." (Opp'n at PageID 1125.) Second, Defendants argue that *Fish I*'s interpretation impermissibly reads into Section 5 a

"presumption," such that the statute would say instead, "*presumptive* minimum amount of information necessary." (*Id.*) Third, Defendants reject *Fish I*'s Election Clause preemption analysis, arguing that the Clause does not regulate "who may vote" in elections, and thus application of *Fish I* here would raise "serious constitutional doubts," by calling for a "strict scrutiny" analysis of Ohio's ability to affirm voter eligibility, which is in the State's sole control. (*Id.* at 1126) (quoting *Inter Tribal*, 570 U.S. at 17.) Lastly, Defendants assert that applying *Fish I* would "invite absurd results," because it would require Ohio to "close its eyes and ears to the documentary proof it receives during the credentialing transaction and offer voter registration to confirmed noncitizens and citizens alike." (Opp'n at PageID 1126.)

Fortunately, the court does not have to address Defendants' arguments opposing *Fish I*, or consider *Fish I*'s legal framework because Defendants acknowledge that the "minimum amount of information necessary" to "enable State election officials to assess the eligibility of the applicant," is signed attestation of citizenship:

| | |
|---|---|
| The Court: | Then for purposes of voting, the minimum voting under the Motor Voter Act the minimum requirements are that you have this attestation, right? |
| Defense Counsel: | Yes. |

(Tr. at PageID 1659; *see also* PageID 1657–58. 1673.) Bolstering this reality is the fact that no other voter registration method in Ohio requires a person to present documentary proof of citizenship along with a registration application. (*See* supra discussion at § I.) As such, the court can conclude that the documentary proof of citizenship clause in Ohio's motor voter statute, § 3503.11(A)(1), conflicts with the NVRA because it is, in fact, more than "the minimum amount of information

necessary to...enable State election officials to assess the eligibility of the applicant[.]" § 20504(c)(2)(B). Therefore, the NVRA preempts § 3503.11(A)(1), as amended by H.B. 54.[13]

*2. Irreparable Harm*

Plaintiffs argue that irreparable injury is presumed here because the law being challenged, H.B. 54, is an obstacle to voting, which is a fundamental constitutional right. (Mot. at PageID 372–73; Tr. at PageID 1615.) However, if the presumption does not apply, Plaintiffs maintain they have made a strong showing of irreparable harm by presenting evidence that the BMV will not allow people to register to vote in conjunction with their driver's license application unless they present all documents necessary to obtain a driver's license. (Mot. at PageID 373–76; Tr. at PageID 1616.) The court agrees.

The Sixth Circuit said in *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012), that, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." While Defendants correctly note that *Obama* involved a Fourteenth Amendment equal protection claim, and the instant lawsuit arises under a federal statute, it still involves the right to vote, as Ohioans seeking to exercise that fundamental right must be registered 30 or more days prior to the election.

---

[13] Amicus Honest Elections Project echos Defendants' criticism of *Fish I*, and frames Defendants' position as seeking to "protect its *own* authority under the Qualifications Clause to 'obtain[] the information necessary to enforce its voter qualifications.'" (HEP Br. at PageID 1441–42) (emphasis in the original) (quoting *Inter Tribal*, 570 U.S. at 17). This argument falls flat given Defendants' admission that the minimum amount of information necessary is signed attestation to citizenship status. The court is cognizant of the Supreme Court's statement in *Inter Tribal* that "it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." 570 U.S. at 17. But Defendants' concession means the court need not tackle that constitutional question to decide whether to enjoin Defendants' enforcement of H.B. 54.

Moreover, "there can be no 'do-over' or redress of a denial of the right to vote after an election," and so a denial of that right "weighs heavily in determining whether plaintiffs would be irreparably harmed absent an injunction." *Fish I*, 840 F.3d at 752 (citing *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *accord Obama*, 697 F.3d at 436)).

Here, when Plaintiffs' members visit the BMV to obtain a driver's license or other state credential in the first instance, or to update their name or address, the NVRA mandates that they be offered the opportunity to register to vote regardless of the success or failure of their driver's license application. Currently, as Ms. Fazio's and Ms. Dutcher's experiences show, that proactive offer is not happening. As such, Plaintiffs' members and other eligible Ohio residents are at risk of missing the October 5, 2026 voter registration deadline because they are not affirmatively offered the opportunity to register to vote in conjunction with their driver's license application. And, if they miss the voter registration deadline, they miss the opportunity to exercise their fundamental right to vote in the November 3, 2026 general election.

Defendants first contend that Plaintiffs do not face any legitimate risk of irreparable harm because Plaintiffs' theory of harm rests on a flawed interpretation of H.B. 54.(Opp'n at PageID 1128; Tr. at PageID 1687–88.) Given the court's earlier determination that H.B. 54 is, in effect, a documentary proof of citizenship requirement, this argument against a finding of irreparable harm is not well-taken.

Defendants next assert that Plaintiffs' delay in moving for injunctive relief weighs against a finding of irreparable harm. (*Id.*) A party seeking a preliminary injunction "must generally show reasonable diligence," even in election law cases. *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (concluding plaintiffs six-year delay in moving for injunctive relief in an action challenging

congressional redistricting maps was unnecessary); *see cf., King v. Whitmer*, 505 F. Supp. 3d 720, 731 (E.D. Mich. 2020) (finding plaintiffs did not diligently pursue claims regarding treatment of election challenges because they filed more then 21 days after the election and could have raised the challenge before).

Here, Plaintiffs filed their Complaint on August 22, 2025, less than two months after H.B. 54 to effect on June 30, 2025. Plaintiffs then filed the instant Motion on April 28, 2026, before the 2026 primary and general elections for federal offices (May 5, 2026 and November 3, 2026, respectively).[14] The court acknowledges that the 2025 general election for state and local offices in Ohio occurred before Plaintiffs moved for injunctive relief.[15] However, the NVRA's requirements apply to federal elections only, making Plaintiffs' claims more relevant in the 2026 election cycle. Because Plaintiffs filed their Complaint and the instant Motion for Preliminary Injunction before the 2026 elections, and before the 2026 general election voter registration deadline, the court finds Plaintiffs showed reasonable diligence in seeking injunctive relief.

Accordingly, Plaintiffs have shown a substantial risk of irreparable harm absent an injunction enjoining Ohio's enforcement of H.B. 54 as it pertains to § 3503.11 of the Ohio Revised Code.

*3. Balance of Equities*

The court considers the final two preliminary injunction factors—whether an injunction would harm others and where the public interest lies—together because the government is the defendant. *See Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Plaintiffs maintain that

---

[14] *See* Ohio elections, 2026, Ballotpedia.org/Ohio_elections,_2026 (last visited August 10, 2026)

[15] *See* Ohio elections, 2025, Ballotpedia.org/Ohio_elections,_2025 (last visited August 10, 2026).

the balance tips in their favor because the irreparable harm they face is the interference with their members' right to vote. (Mot. at PageID 376.) Furthermore, Plaintiffs contend that Defendants will not be injured by the issuance of an injunction because "they would merely be restrained from enforcing an unlawful statute." (*Id.*) Conversely, Defendants argue the balance of equities weighs in their favor because 1) the injunction would not preserve the status quo; 2) the public interest weighs against enjoining a "duly enacted statute;" and 3) Plaintiffs requested relief would require BMV staff to proactively offer voter registration to everyone, even to confirmed noncitizens. (Opp'n at PageID 1128–29.)

The court recognizes that there is "a strong public interest in permitting legitimate statutory processes to operate to preclude voting by those who are not entitled to vote." *Summit Cnty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547 (6th Cir. 2004). This interest undoubtedly extends to voter registration and ensuring only U.S. citizens are added to Ohio's voter rolls. But, as the rest of Ohio's voter registration scheme demonstrates, and Defendants' statements at the Hearing shows, election officials do not need documentary proof of citizenship to assess a voter registration applicant's citizenship because signed attestation of citizenship is enough. (Tr. at PageID 1659; *see also* PageID 1657–58. 1673.) Accordingly, the public interest in allowing statutory processes to operate to preclude noncitizen voting is still represented if H.B. 54 is enjoined.

On the other hand, the "strong public interest in allowing every registered voter to vote," *Summit County*, 388 F.3d at 551, an interest which extends to voter registration and ensuring as many eligible U.S. citizens as possible become registered to vote, will be denied absent an injunction. Such an outcome would be contrary to the NVRA's purpose, and a strain on the fundamental right to vote.

Additionally, the injunction Plaintiffs seek will not require BMV employees to proactively offer voter registration applications to confirmed noncitizens like Defendants warn. The NVRA "does not preclude States from deny[ing] registration based on information in their possession establishing the applicant's ineligibility." *Inter Tribal*, 570 U.S. at 15 (internal quotations omitted). As previously discussed, Column A of the BMV Form requires applicants to check a box indicating their legal presence in the United States. If the applicant checks permanent resident (non-U.S. citizen), or temporary resident (non-U.S. citizen), then the BMV has "information in their possession establishing the applicant's ineligibility," *i.e.*, status as a noncitizen, and the NVRA does not require the BMV to proactively offer the ineligible applicant the opportunity to register to vote.

Furthermore, the NVRA makes clear that the final decision to add someone to the State's voter rolls is with the appropriate State election official, not the BMV or its employees offering and receiving voter registration forms. Subsection (c)(2)(E) of the Act provides:

> The voter registration application portion of an application for a State motor vehicle driver's license–shall be made available (as submitted by the applicant, or in machine readable or other format) to the appropriate State election official as provided by State law.

52 U.S.C. § 20504(c)(2)(E). In addition, Section 8 of the NVRA "require(s) the appropriate State election official to send notice to each applicant of the disposition of the application." *Id.* § 20507(1)(2). Thus, even if a BMV official errs by offering a voter registration application to a noncitizen, that application does not automatically result in registration because state election officials must still assess the applicant's eligibility, and then notify the applicant whether he or she was added to the voter rolls or not.

This procedural backstop, along with the State's requirement that driver's license applicants

mark their legal presence in Column A of the BMV Form further demonstrate that an injunction enjoining enforcement of H.B. 54 will not upset the public interest in precluding noncitizens from voting.

Lastly, Plaintiffs make clear that they seek an injunction that:

> prohibits Defendants from relying on H.B. 54 to require any driver's license applicant to produce DPOC before registering to vote, and that orders the BMV to offer the opportunity to register to vote to anyone (except confirmed noncitizens or other ineligible persons) who submits a driver's license application, even if the applicant fails to submit all the documents necessary to obtain a driver's license.

(Reply at PageID 1531; *See also* Tr. at PageID 1709.) Plaintiffs are "agnostic about the process" Defendants employ to comply with an injunction, "as long as [voter registration] is proactively offered to the applicant in conjunction with a driver's license transaction." (Tr. at PageID 1710.)

Accordingly, the court finds that the balance of equities tips in favor of granting a preliminary injunction.

*4. Conclusion*

The court finds that Plaintiffs have established a likelihood of success on the merits of Count I, which alleges that § 3503.11, as amended by Ohio House Bill 54, conflicts with Section 5 of the National Voter Registration Act, that there is a substantial risk of irreparable harm absent an injunction, and that the balance of equities weigh in favor of granting a preliminary injunction.

## V. CONCLUSION

More than three decades ago, federal lawmakers on both sides of the aisle recognized that more eligible citizens would exercise their fundamental right to vote if they had easier ways to register. Empowered by the Elections Clause of the U.S. Constitution to "by law make or alter

[State] regulations" of how citizens register to vote for federal elections, Congress passed the National Voter Registration Act.

The result of Congress's action? More registered voters. In 2024, the most recent federal general election, 86.6 percent of the citizen voting age population were active registered voters.[16] That voter registration rate is approximately 20 percent higher than it was in 1994 when the NVRA became law.[17] Between the 2022 and 2024 general elections, more than 103 million registration transactions were processed, with motor vehicle offices accounting for nearly one-third of those.[18] The popularity of registering to vote with a motor vehicle office is unsurprising since the NVRA requires states to proactively offer voter registration applications for federal office to people submitting driver's license applications. That offer means people who need to obtain or update a driver's license or state identification card are presented with an opportunity to register to vote, instead of being required to seek one out. Such a process helps ensure that elections "discern[] the will of the majority," rather than "testing the administrative capacity of a citizen."[19]

Currently, Ohio's process for offering voter registration simultaneously with driver's license applications does not comply with Section 5 of the NVRA. The record shows that the registrar or

---

16 *See* U.S. ELECTIONS ASST. COMM'N, ELECTION ADMINISTRATION AND VOTING SURVEY iv (2025) [hereinafter EAVS] (Pls.' Ex. 5, ECF No. 29-6.) https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf.

17 *See* William J. Clinton, President of the United States, Remarks on Signing the National Voter Registration Act of 1993 (May 20, 1993), *in* Weekly Compilation of Presidential Documents, May 1993, Vol. 29 at 914, 915 ("As many as 35 percent of otherwise eligible voters in our Nation are not registered").

18 EAVS, *supra* note 16 at iv.

19 Clinton, *supra* note 17.

deputy registrar of the BMV is only required to offer voter registration to those driver's license applicants who successfully obtain a license. Thus, Ohio has made the voter registration offer contingent on the success of a person's driver's license application. That sequencing is not what Congress intended when it said: "[e]ach State motor vehicle driver's license application...submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office[.]" 52 U.S.C. § 20504(a)(1). Rather, the everyday understanding of this general mandate is that States must offer voter registration to driver's license applicants when they submit their applications for the BMV's consideration, not upon the BMV's approval. To interpret this section of the NVRA otherwise would allow States to make registering to vote at the BMV more onerous, and could result in fewer voter registrations because the opportunity to apply was not proactively offered to otherwise eligible citizens.

Not only does Ohio's motor voter system run afoul of the NVRA in practice, it also conflicts with the Act by statutorily requiring applicants to produce documentary proof of citizenship before registering to vote simultaneously with their driver's license application. The record shows, and Defendants acknowledge, that signed attestation to U.S. citizenship is "the minimum amount of information necessary," § 20504(c)(2)(B)(ii), to enable Ohio's election officials to assess voter eligibility and administer other parts of the election process. Despite this fact, Ohio's motor voter statute says:

> When any person applies for a driver's license...and the person presents proof of United States citizenship to the registrar of motor vehicles or the deputy registrar, or has previously presented proof of United States citizenship...the registrar or deputy registrar shall offer the applicant the opportunity to register to vote[.]

Ohio Rev. Code § 3503.11(A)(1) (as amended June 30, 2025). Thus, under this provision, a person

otherwise eligible to register to vote, only receives the affirmative offer that the NVRA commands, if they present proof of citizenship. That proof of citizenship requirement is more than the signed attestation to U.S. citizenship that Ohio's other voter registration methods accept. Therefore, § 3503.11, as amended by H.B. 54, likely conflicts with the NVRA, because it is more than "the minimum amount of information necessary[.]" Accordingly, the court finds that a preliminary injunction enjoining Defendants' enforcement of the proof of citizenship requirement added to Ohio's motor voter statute by H.B. 54 is warranted.

Therefore, the court grants Plaintiffs' Motion for Preliminary Injunction (ECF No. 29). Defendants, their agents, and their successors are hereby enjoined from relying on House Bill 54's amendment to Ohio Revised Code § 3503.11(A)(1) to require any driver's license applicant, first issuance or renewal, to produce documentary proof of citizenship before offering the opportunity to register to vote. This includes driver's license applicants who are ultimately unsuccessful in obtaining a driver's license for lack of sufficient documents under Ohio's licensing requirements. It does not include driver's license applicants who indicate in Column A of BMV Form 5745 that they are a U.S. National, Permanent Resident, or Temporary Resident, or those driver's license applicants who otherwise present information showing they are noncitizens.

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

August 25, 2026