**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RED WINE & BLUE, and OHIO ALLIANCE FOR RETIRED AMERICANS,** | : | |
| **Plaintiffs,** | : | **Case No. 1:25-cv-01760** |
| **v.** | : | **Judge Solomon Oliver, Jr.** |
| **FRANK LAROSE, in his official capacity as Ohio Secretary of State; and CHARLES L. NORMAN, in his official capacity as Ohio's Registrar of Motor Vehicles,** | : | **Mag. Judge James E. Grimes, Jr.** |
| **Defendants.** | : | |

---

# MOTION FOR STAY PENDING APPEAL

---

Pursuant to Federal Rule of Civil Procedure 62, Defendants Ohio Secretary of State Frank LaRose and Charles L. Norman move this Court for an order staying enforcement of the preliminary injunction issued on August 25, 2026. Doc. 57. A memorandum in support of this motion is attached.

Respectfully submitted,

D. ANDREW WILSON
Ohio Attorney General

*/s/ Ann Yackshaw*
ANN YACKSHAW (0090623)*
**Counsel of Record*
JULIE M. PFEIFFER (0069792)*
STEPHEN P. TABATOWSKI (0099175)
GREGORY A. RUSTICO (0104103)
Assistant Attorneys General
Constitutional Offices Section

30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Ann.Yackshaw@OhioAGO.gov
Julie.Pfeiffer@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
Gregory.Rustico@OhioAGO.gov

*Counsel for Defendants*

## MEMORANDUM IN SUPPORT

## I. BACKGROUND

On August 25, 2026, the Court enjoined Ohio Rev. Code § 3503.11, which requires deputy registrars to offer individuals the opportunity to register to vote when the individual presents proof of U.S. citizenship to the deputy registrar or has done so in the past (the "BMV Registration Provision"). In doing so, it drastically expanded the reach of the National Voter Registration Act and threw a wrench into Ohio's preparations for the upcoming election.

The scope of this injunction barely resembles the relief sought in Plaintiffs' complaint or in their motion for preliminary injunction. In their complaint, Plaintiffs asked the Court to declare that Ohio Rev. Code § 3503.11's "proof-of-citizenship provision violates the National Voter Registration Act and the First and Fourteenth Amendments to the U.S. Constitution." Doc. No. 1 at PageID 30. And in their motion for preliminary injunction, Plaintiffs reiterated their request to "preliminarily enjoin enforcement of the documentary proof-of-citizenship requirement of [the BMV Registration Provision] so that customers of the Bureau of Motor Vehicles may register to vote in conjunction with a driver's license application by providing a sworn attestation of citizenship." Doc. No. 29 at PageID 351.

The preliminary injunction in this case, however, is not a simple injunction of any supposed proof-of-citizenship requirement. Instead, it is a startling federal intrusion into Ohio's credentialing process. Neither Plaintiffs' complaint nor preliminary-injunction motion asked this Court to apply the NVRA to *incomplete* applications for driver's licenses. *See* Doc. No. 1 at PageID 30; Doc. No. 29 at PageID 351. But in response to Plaintiffs' request at oral argument, the Court determined that the NVRA applies to incomplete driver's license applications and requires deputy registrars to offer voter registrations proactively to unsuccessful applicants for driver's licenses. Doc. No. 57 at PageID 1840–41.

Specifically, the Court enjoined Defendants Frank LaRose, Charles Norman, "their agents, and their successors are hereby enjoined from relying on House Bill 54's amendment to Ohio Revised Code § 3503.11(A)(1) to require any driver's license applicant, first issuance or renewal, to produce documentary proof of citizenship before offering the opportunity to register to vote. This includes driver's license applicants who are ultimately unsuccessful in obtaining a driver's license for lack of sufficient documents under Ohio's licensing requirements." Doc. No. 57 at PageID 1842.

This preliminary injunction order cannot be implemented within the year, much less before the 2026 General Election. The inclusion of incomplete applications within the scope of the injunction imposes an enormous burden on the BMV and sets the agency a Herculean task. It requires the BMV to take intensive affirmative action—e.g., creating and implementing the administrative processes, IT programs, and recordkeeping and data-storage systems necessary to comply with the injunction—that is simply not feasible on an immediate basis. Indeed, these changes would take up to a year to fully implement and, all told, cost the BMV an estimated $1 million.

This injunction should be stayed pending appeal.

## II. LAW AND ARGUMENT

### A. Legal standard

When considering a motion for stay pending appeal, the Court considers "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) (quoting *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). These factors

are not each prerequisites to a stay pending appeal but are "interconnected considerations" to be balanced by the reviewing court. *Id*. Here, these factors favor Defendants.

**B. The injunction is impermissibly vague.**

Every order granting a preliminary injunction must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). This specificity provision is no mere "technical requirement[]." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). It prevents "uncertainty and confusion on the part of those faced with injunctive orders" and enables "an appellate tribunal to know precisely what it is reviewing." *Id.* at 476–77. An ordinary person reading a court's preliminary injunction must be able to "ascertain from the document itself exactly what conduct is proscribed." *Union Home Mtge. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022) (citation modified).

This Court's order roundly fails the ordinary-person test. The preliminary injunction (1) contradicts itself, (2) does not clearly state when it applies, and (3) fails to provide enough detail to notify Defendants of the acts restrained or required.

Begin with the internal inconsistencies. The Court enjoined Defendants from requiring any driver's license applicant "to produce documentary proof of citizenship *before* offering the opportunity to register to vote." Doc. No. 57 at PageID 1842 (emphasis added). But the injunction does not apply to applicants who self-identify as non-citizens or "otherwise present information showing they are noncitizens." *Id*. Applicants must present proof of citizenship or non-citizenship during the credentialing process. Ohio Rev. Code § 4507.06; Ohio Adm. Code § 4501:1-1-21. How, then, are deputy registrars supposed to both (1) offer the opportunity to register to vote *before* documents establishing citizenship are presented, but also (2) *not offer* the opportunity to register to vote for applicants who present documents establishing non-citizenship? If deputy registrars offer the opportunity to register *before* eliciting citizenship documents during the

credentialing transaction, must they then un-register voters who go on to present proof of non-citizenship? And if so, how? The injunction does not say.

Next, the preliminary injunction does not describe the circumstances under which it will apply. The Court says that the NVRA applies to "all driver's license applications submitted to a State's motor vehicle authority, regardless of the application's success or failure." Doc. No. 57 at PageID 1811. But the order never states when an application ought to be considered "submitted." As set forth in Defendants' opposition, a driver's license application has many components: the skills test, the vision test, the photography requirement, and the other information required under Ohio Rev. Code § 4507.51(A)(1)(a)-(d). Doc. No. 35 at PageID 1124; *see also* Declaration of Sydney King ¶¶ 26-28, attached hereto as Exhibit A. And of course, the applicant must also supply proof of identity. So, is an application "submitted" to the deputy registrar if a customer fills out the identity information on BMV Form 5745 but does not complete the skills or vision test? Is an application "submitted" if a customer brings a completed BMV Form 5745 to a deputy registrars' office but is told upon arrival that the customer lacks a necessary document? *See* King Decl. ¶ 24 (describing the common practice of triaging customers at the door). Is an application "submitted" if a customer fills out the BMV Form 5745 with the assistance of a deputy registrar and discovers during the transaction that a necessary document is missing? *Id.* at ¶ 27. The order does not say.

Finally, the preliminary injunction does not describe in reasonable detail the acts restrained or required by deputy registrars and the BMV. Must the BMV and deputy registrars offer unsuccessful driver's license applicants the opportunity to register to vote through the point-of-sale system and transfer those registrations to elections officials electronically? If so, may deputy registrars, in line with current practice, triage driver's license applicants at the door and inform applicants without the necessary documents that they will be unable to apply for a driver's license?

Or does the injunction mean that each would-be applicant must wait in line so that the applicant can meet with a deputy registrar, fill out forms they cannot file, and be afforded an opportunity to register to vote?

Alternatively, can deputy registrars comply with the injunction by proactively offering paper registration forms to unsuccessful applicants and mailing these forms to elections officials? If so, must deputy registrars fill out the portions of the paper registration form that duplicate the information included on the driver's license application? 52 U.S.C. § 20504(c)(2)(A) (prohibiting States from requiring any information on the voter registration application that duplicates information required in the driver's license application).

The Court did not fill in these details, presumably because Plaintiffs said they were "agnostic" as to the injunction's implementation. Doc. No. 57 at PageID 1839. But when Defendants risk "a contempt citation on a decree too vague to be understood," agnosticism on the implementation process does not suffice. *See Schmidt*, 414 U.S. at 476 (citations omitted). The injunction is impermissibly vague and must be stayed pending appeal under Rule 65(d).

**C. The *Purcell* doctrine requires a stay.**

H.B. 54 took effect on June 30, 2025, more than one year ago. Nevertheless, Plaintiffs waited nearly a year to seek "emergency" relief on April 28, 2026. *See generally* Doc. No. 29. The Court issued a preliminary injunction on August 25, *see* Doc. No. 57, less than six weeks before the close of voter registration on October 5, *see* 2026 Ohio Elections Calendar, *available at* https://www.ohiosos.gov/assets/election-calendar-2026.pdf. As set forth more fully in Part II.D *infra*, the injunction imposes immense burdens on the BMV, deputy registrars' offices, and elections officials. While the harm to Defendants alone suffices for a stay pending appeal, the timing of the injunction also places this case squarely within the *Purcell* doctrine, which independently demands a stay.

It is a "bedrock tenet of election law" that courts should decline to alter state election procedures on the eve of an election. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring); *see generally Purcell v. Gonzalez*, 549 U.S. 1 (2006). Time and again courts have recognized that when an election is imminent, judicial interference in elections "can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881; *see also Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 897–98 (6th Cir. 2024) (staying an injunction issued less than a month before a registration deadline); *Kennedy v. Benson*, 119 F.4th 464, 469–470 (6th Cir. 2024) (denying a petition for en banc review based, in part, on the plaintiff's delay in seeking relief). Accordingly, there is a strong presumption against granting injunctive relief altering election procedures when an election is imminent. This is true irrespective of the merits of the underlying claims. *See Kennedy*, 119 F.4th at 471 (Griffin, J., concurring in the denial of rehearing) (noting that *Purcell* recommends avoiding court intervention in candidate-withdrawal issues "[i]rrespective of the correctness of the . . . Secretary of State's decision").

Further, while *Purcell* applies even if the injunction would be easy to administer, it demands federal courts stay their hands when state officials must scramble to "devise plans to implement" an order. *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring) ("Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences."). As set forth more fully in Section II.D *infra*, the Court's changes to Ohio's credentialing and voter-registration processes are drastic. Even absent *Purcell*, Sixth Circuit precedent disfavors preliminary injunctions that interrupt the status quo. *See Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526 (6th Cir. 2017) (noting that the remedy is

"reserved only for cases in which it is necessary to preserve the status quo"). But in matters of election administration, *Purcell* simply does not permit "late-breaking injunctions" that upend a State's elections rules. *Merrill*, 142 S. Ct. at 881. Application of the *Purcell* principle therefore demands that this Court stay the injunction.

**D. The injunction imposes immense administrative burdens on the BMV and elections officials by upending the State's voter-registration laws.**

As set forth above, the Court ordered Defendants to offer voter registration proactively to unsuccessful applicants for driver's licenses. Doc. No 57 at PageID 1842. No grace period was given for the order's implementation. Absent a stay, Defendants will be irreparably harmed by this injunction.

If the injunction means that deputy registrars must proactively offer voter registrations through the BMV's point-of-sale system, it would be difficult to overstate the resulting harm. First, as set forth in Part II.B *supra*, the Court created a class of individuals, individuals who "submitted" unsuccessful driver's license applications, that BMV cannot accurately identify or track. The BMV does not currently retain any records or information for unsuccessful driver's license applicants. Declaration of Syndey King at ¶¶ 5–9, *attached* hereto as Exhibit A. Rather, information becomes part of the BMV's record when—and only when—an individual successfully applies for a driver's license. *Id.* at ¶ 9. That information is stored in the BMV's Genesis system, where it can then be shared among other state and local agencies.[1] *Id*. at ¶¶ 4–5. The BMV does not have any system or program to retain, store, or electronically transfer voter-registration information that is not

[1] As one example, the Help America Vote Act requires the Secretary of State to "match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B). Currently, BMV data is supported by documentary evidence, so it is a good tool to verify the accuracy of information on applications for voter registration.

connected to a successful driver's license application, and it would have to create them from scratch. *Id*. at ¶ 11. The BMV would need to reassign IT staff to rewrite the point-of-sale system, establish a new process, construct a new data-storage system siloed from the BMV's current system, and train the deputy registrars to administer this new process. *Id*. ¶¶ 11–16. This would take up to a year, and could cost the BMV up to $1 million. *Id*. It is not feasible to implement the foregoing changes before the 2026 General Election, much less with immediate effect.

Requiring deputy registrars to offer voter registration to unsuccessful driver's license applicants would also result in duplicate registrations. King Decl. ¶ 16. Unsuccessful applicants for driver's licenses frequently return the same day to complete and submit their applications. *Id.* Offering registration at both the incomplete-application stage and complete-application stage would necessarily result in duplicate voter registrations, which the BMV and the Secretary's Office would need to reconcile. *Id*. at ¶¶ 16–17.

The recordkeeping and administrative burdens on the BMV would be severe, as described above. But deputy registrars would also sustain financial damage. Deputy registrars are independent contractors who make money from collecting fees for BMV transactions like driver's license issuances, vehicle registrations, and similar transactions. King Decl. ¶¶ 20–23. It is already difficult to find independent contractors to operate deputy registrars' offices, and increasing the number of no-fee transactions will only deepen this problem. *Id*.

Even the least burdensome method of complying with the injunction—proactively offering paper registration forms to every unsuccessful applicant—would irreparably harm Defendants. *Id.* at ¶ 25. The BMV would need to design and implement a process for offering these forms, and train deputy registrars and their employees when and how these forms must be offered. *Id.* The BMV would need to implement a process to copy information from the incomplete driver's license

application to the voter-registration form. *Id.* After all, if the NVRA applies at this step, it forbids the State from requiring voter registration information that duplicates information required in the driver's license application. 52 U.S.C. § 20504(c)(2). The BMV and the Secretary's Office would need to implement a process to detect and reconcile duplicate registrations. *Id.* ¶¶ 16–17, 25. And deputy registrars would also incur significant financial and administrative costs. *Id.* ¶¶ 20–25.

The State always suffers irreparable harm when its lawful regulations are enjoined. *See Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020) (per curiam). But here, the harm is particularly acute because state officials will need to scramble to devise plans to implement this Court's order on the fly. Moreover, the public interest also favors a stay to "give effect to the will of the people by enforcing the laws . . . their representatives enact." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (per curiam).

Balanced against these serious harms to Defendants and the public, a stay will not harm Plaintiffs. This Court found irreparable harm based on the experiences of two of Plaintiffs' members—both of whom have since successfully registered to vote. Doc. No. 57 at PageID 1816–27. There is thus no danger that a stay of the injunction will prevent them from registering or voting. Although the Court surmised that "future Ohioans will suffer the same harm Plaintiffs allege," *see id.* at PageID 1828, there is not one scintilla of evidence of such harm in the record. Accordingly, the balance of equities strongly favors a stay pending appeal here.

**E. Defendants are likely to succeed on the merits.**

Although the irreparable harm to Defendants suffices to issue a stay pending appeal, the weakness of Plaintiffs' NVRA claim underscores the need for a stay here. The Court's analysis of Plaintiffs' claim turned on two issues: (1) "the meaning of 'application submitted'" under the NVRA, and (2) a purported concession made by counsel for Defendants. Doc. No. 57 at PageID 1806, 1833. Respectfully, on both issues, the Court missed the mark.

Under the NVRA, a driver's license application "submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration." 52 U.S.C. § 20504(a)(1). On the voter registration portion of the driver's license application, the State "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant." 52 U.S.C. § 20504(c)(2)(B). Here, the Court concluded that, under the NVRA, an application for an Ohio-issued credential is "submitted" when it is presented to the BMV for consideration, regardless of whether the application is deemed completed or "submitted" under Ohio law. Doc. 57 at PageID 1806–11. Accordingly, the Court concluded that the NVRA applies to incomplete applications for driver's licenses, and the State may therefore require "only the minimum amount of information necessary to" assess an unsuccessful applicant's eligibility. *Id.* at PageID 1815 (citing 52 U.S.C. § 20504(c)(2)(B)). According to the Court, counsel for Defendants conceded a sworn attestation of citizenship is the "minimum amount of information necessary" for Ohio to assess eligibility. *Id.* at PageID 1833–34. From there, the Court concluded that the BMV Registration Provision conflicts with the NVRA by requiring proof of citizenship from unsuccessful driver's license applicants. *Id.* at PageID 1834.

This analysis will not survive appellate review. Begin with the purported concession, which conflates the terms "requirement" and "information." The Court asked counsel for Defendants whether, "under the Motor Voter Act," a sworn attestation was a "minimum *requirement*." Doc. No. 57 at PageID 1833. The Court did not ask whether an attestation was the "minimum amount of *information* necessary" for Ohio to assess eligibility under 52 U.S.C. § 20504(c)(2)(B). *Id.* at PageID 1833. This is not just semantics. The NVRA imposes specific eligibility *requirements* for voter registration while also limiting the amount of *information* a State can collect during the process. A sworn attestation of citizenship is an "eligibility requirement" under the NVRA. 52

U.S.C. § 20504(c)(2)(C)(i)–(ii) (requiring the voter registration portion of an application for driver's license to include a statement that "states each eligibility requirement (including citizenship)" and "contains an attestation that the applicant meets each such requirement"). In other words, an attestation is a "minimum requirement," or statutory floor, under 52 U.S.C. § 20504(c)(2)(C)(i)–(ii). In contrast, the "minimum amount of *information* necessary" for Ohio to assess eligibility is a statutory ceiling: it is the most information Ohio can ask an applicant to provide.

So, Defendants agree that the citizenship attestation could be characterized as a "minimum *requirement*" under the NVRA. 52 U.S.C. § 20504(c)(2)(C). But that is in no way a concession that an attestation is also "the minimum amount of *information* necessary" for Ohio to assess an applicant's eligibility. 52 U.S.C. § 20504(c)(2)(B). Defendants did not—and do not—concede that an attestation is the minimum amount of *information* necessary to assess eligibility for registrations initiated through the BMV. That cannot be true, because the BMV knows the citizenship of applicants.

The Court got around this issue by concluding that the NVRA kicks in *before* the driver's license application is completed. Specifically, the Court believed that an application can be "submitted" while remaining incomplete. Doc. 57 at PageID 1810–11. So, the Court ruled that deputy registrars must affirmatively offer unsuccessful applicants the opportunity to register, even if the applicant has not presented DPOC. But this conclusion contradicts the relevant statutory scheme, BMV practice, and stretches the NVRA far beyond what it can bear. As Defendants explained to the Court, a driver's license application includes many components: identity confirmation, a skills test, a vision test, a photography requirement, and other statutory requirements. Doc. No. 35 at PageID 1124; *see also* King Decl. ¶¶ 26-28. Additionally, the

"application *shall* be accompanied by any necessary documents, as required by the registrar." Ohio Rev. Code § 4507.51(a)(4) (emphasis added). An application therefore cannot be "submitted" unless and until all the statutory components, including all necessary documents, are present.

As set forth in Section II.B. *supra*, any other conclusion invites regulatory chaos. If an incomplete application can be deemed "submitted," how much of the application must be completed before it will be considered "submitted"? Just identity confirmation? If a customer completes the BMV Form 5745 but refuses to submit to a vision test, has that customer "submitted" an application? What if the customer completes the BMV Form 5745 but BMV records indicate that the customer never passed a driving skills test? Has an application been "submitted"? If a customer passes the driving skills test and vision test, but cannot complete the BMV Form 5745, is that customer's application "submitted"? What about customers who renew credentials online? Have they "submitted" an application when they provide information to confirm their identity but fail to complete the application? *See* King Decl. ¶¶ 26-28. The Court's interpretation of "submitted" does not answer any of these questions and throws the BMV and deputy registrars into chaos. Defendants' interpretation of "submitted," on the other hand, reflects BMV's governing statutes and current practice. It should control here.

Finally, Defendants are likely to prevail on appeal because the Court's decision sets the NVRA on a collision course with Ohio's own constitutional powers. The NVRA is a voting-rights statute passed under Congress's Elections Clause authority; it has nothing to say about how states administer their state-issued credentials. Nor does it have anything to say about voter qualifications. Thus, the NVRA cannot preempt Ohio's credentialing or qualifications requirements.

Indeed, in the voter-qualifications context, the NVRA stands on shaky ground. It's clear that "[t]he NVRA still leaves room for policy choice. The NVRA does not list, for example, all the other information the State may—or may not—provide or request." *Young v. Fordice*, 520 U.S. 273, 286 (1997). And the Supreme Court has expressed "serious constitutional doubts" about federal laws precluding a State "from obtaining the information necessary to enforce its voter qualifications." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 (2013). The Elections Clause "empowers Congress to regulate *how* federal elections are held." *Id.* But it does not permit Congress to determine "*who* may vote in them." *Id.* Instead, that power "sprang from the Framers' aversion to concentrated power," *id.* at 17, and it is reserved to the States, U.S. Const. art. I, § 2; *id.* amend. XVII.

Here, the Court reads the NVRA to preempt the way Ohio administers the issuance of state identification, as well as the way it evaluates the qualifications of voters. The Elections Clause simply does not confer the authority to invalidate Ohio's credentialing laws; nor does the NVRA do so. Reading the statute otherwise strikes at the heart of federalism, and the constitutional concerns that arise from such a reading are all the more reason to stay the preliminary injunction.

## III. CONCLUSION

For these reasons, the Court should stay the preliminary injunction pending appeal.

Respectfully submitted,

D. ANDREW WILSON
Ohio Attorney General

*/s/ Ann Yackshaw*
ANN YACKSHAW (0090623)*
**Counsel of Record*
JULIE M. PFEIFFER (0069792)*
STEPHEN P. TABATOWSKI (0099175)
GREGORY A. RUSTICO (0104103)
Assistant Attorneys General

Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Ann.Yackshaw@OhioAGO.gov
Julie.Pfeiffer@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
Gregory.Rustico@OhioAGO.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026 the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the court's system.

*/s/Ann Yackshaw*
ANN YACKSHAW (0090623)
Assistant Attorney General