# Exhibit A:

## Declaration of Sydney King

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RED WINE & BLUE, and OHIO ALLIANCE FOR RETIRED AMERICANS,** | : | |
| **Plaintiffs,** | : | **Case No. 1:25-cv-01760** |
| **v.** | : | **Judge Solomon Oliver, Jr.** |
| **FRANK LAROSE, in his official capacity as Ohio Secretary of State; and CHARLES L. NORMAN, in his official capacity as Ohio's Registrar of Motor Vehicles,** | : | **Mag. Judge James E. Grimes, Jr.** |
| **Defendants.** | : | |

---

**DECLARATION OF SYDNEY KING**

---

I, Sydney King, hereby state that I am over the age of eighteen years and am competent to testify to the following on the basis of personal, firsthand knowledge.

1. I currently serve as the Chief Policy Advisor in the Bureau of Motor Vehicles. I have been in this position since July of 2022. As the Chief Policy Advisor, I am responsible for managing major BMV initiatives, which includes organizing legislative and operational priorities, engaging with all BMV sections to address policy and statutory questions, connecting with external stakeholders to communicate BMV positions, and developing policy recommendations and directions for key issues.

2. Through my position as Chief Policy Advisor, I am familiar with the equipment, computers, and systems used by the BMV and the deputy registrars appointed by the Registrar of Motor Vehicles.

3. BMV uses a platform called Genesis to maintain the BMV's official records for individuals who interact with the BMV. Genesis receives data from many different sources, including but not limited to, the point-of-sale system, BASS, used by all deputy registrars. Deputy registrars use BASS to process applications for driver's licenses and state identification cards. Genesis also receives data from law enforcement, other states, and courts, among other sources.

4. BMV is statutorily obligated to share data with other state agencies, including the Secretary of State's Office, law enforcement agencies, the Ohio Department of Education, the Ohio Department of Veteran's Affairs, the Ohio Attorney General's Office, the Ohio Department of Job and Family Services, and others. BMV has entered into MOUs with many of these state

agencies, including the Secretary of State's Office, that govern the data-sharing obligations of BMV and the receiving agencies.

5. Under federal law, 18 US.C. 2721 et seq., BMV is prohibited from sharing or selling personal information obtained by BMV except as authorized by the federal statute. Federal law imposes penalties for violations and makes violators liable to the individual whose information was unlawfully released. Accordingly, BMV imposes data-security requirements on state agencies with whom it shares data. State agencies, in turn, are not permitted to share or sell data received from BMV.

6. BMV keeps and stores information about applicants for driver's licenses or identification cards only upon the completion of a successful application. When the applicant successfully completes a driver's license transaction, the applicant's information is entered into BASS and ultimately transferred to Genesis, where the applicant's information becomes part of the applicant's official BMV record.

7. If an individual attempts to apply for a driver's license without presenting all of the required documentation to receive a license, the deputy registrar does not even begin a transaction in BASS. No record of the failed application exists in BASS, and the BMV does not keep or store any information about the applicant.

8. Even if an individual presents the required documentation to receive a driver's license, the individual's application may still be unsuccessful. This can occur when, for example, an individual presents identification documents that do not match the Social Security Online Verification Service, which the deputy registrar must use to verify identity. Under these circumstances, BASS does not save that individual's information and no record of the abandoned application exists in BASS.

9. Accordingly, only when an applicant can successfully complete a driver's license or identification card application transaction is that applicant's information entered into and stored by BASS for transmission to Genesis, where the information becomes part of that applicant's official BMV record and can be shared with other state agencies.

10. If deputy registrars were required to offer voter registration applications through BASS to individuals who do not complete applications for driver's licenses, the burden on BMV would be immense.

11. BMV would have to rewrite the BASS system completely. BMV would need to rewrite BASS to create an entirely new transaction: a failed driver's license application with voter registration application. BMV would need one BASS process for individuals whose driver's license application transaction never began in BASS and one BASS process for individuals whose driver's license application transaction began but was ultimately abandoned. The process for abandoned applications would need to be designed to capture all information collected in the abandoned driver's license application and copy that information to the voter registration portion of the transaction. The NVRA prohibits states from requiring voter registration information that duplicates information required in the driver's license application. 52 U.S.C. 20504(c)(2).

12. BMV would need to create a new system to store the information collected from individuals during the processes described in Paragraph 8 *supra*. Data collected during a failed driver's license application could not be funneled into Genesis, the existing system for maintaining BMV data, for several reasons.

13. All information currently maintained in Genesis is supported by documentary evidence. For example, Genesis includes the name, address, social security number, date of birth, and citizenship of every successful applicant for a driver's license, and each piece of information

was supported by documentary evidence when presented to BMV. Other state agencies who receive information from BMV, *see* Paragraph 4 *supra*, can rely on this information's accuracy when they receive BMV information to perform their official duties. For example, the Secretary of State's Office is statutorily obligated to use citizenship information submitted to BMV to assess the eligibility of individuals registered to vote. Ohio Rev. Code § 3503.152(A).

14. In contrast, voter registration information provided by a failed driver's license applicant would not be supported by documentary evidence. This unsupported data could not be shared with other agencies that receive and rely on BMV data to perform their official duties. For example, when conducting the review of BMV records required by Ohio Rev. Code § 3503.152, the Secretary of State could not rely on an incomplete driver's license application that may or may not have included documentary proof of citizenship. BMV would therefore have to create a siloed data-storage system for unverified voter registration information collected during a failed driver's license application.

15. Creating these new processes would be expensive and administratively burdensome. Genesis and BASS are both maintained by BMV in house. BMV would need to reassign IT staff from their current duties to write the new programs for Genesis and BASS to process voter registrations for failed driver's license applicants. As described in Paragraphs 9-11 *supra*, IT staff would also need to develop a new system to store voter registration data that is siloed from the Genesis system. IT staff would need to develop data protections for this information if required under federal law, *see* Paragraph 5 *supra*. Additionally, BMV staff would need to develop new training for deputy registrars to process voter registrations for failed driver's license applicants in BASS.

16. IT staff at BMV and the Secretary's Office would also need to develop protocols for duplicate records. Many individuals who appear at deputy registrars' offices without the necessary documents to obtain a driver's license return later the same day with the necessary documents. BMV sends voter registration updates to the Secretary of State every day. If deputy registrars are forced to offer voter registration during both the failed and successful driver's license transactions, duplicate records may be created and sent to the Secretary's Office. Both BMV and the Secretary's Office would need to develop new protocols to identify these duplicate records and ensure that the duplicate applications result in just one voter registration.

17. The injunction may also result in erroneous voter registrations. For example, an unsuccessful applicant for a driver's license might submit outdated or mistaken information to the deputy registrar based on old documents. Under this order, deputy registrars would be required to submit a voter registration application with this old information. As set forth above, that applicant often returns later that day or week to complete the driver's license transaction. If the applicant registered to vote during the unsuccessful BMV transaction, the applicant may not register again with the correct information. This incorrect information therefore becomes part of the applicant's voter registration and could prevent that applicant from voting.

18. I estimate that the steps needed to create a new process in BASS, create a new method of storing voter registration data, and develop and administer deputy registrar training would take a year to complete. I base this estimate on similar projects that involved creating new transactions in BASS or significantly altering the process for existing transactions. Typically, such projects take anywhere from 8 months to 1.5 years to develop and implement. For example, the General Assembly recently required BMV to establish a process for individuals in the custody of the Department of Rehabilitation and Correction or the Department of Youth Services to obtain state identification cards from BMV. To allow BMV, DRC, and DYS sufficient time to create and

implement this new program, the General Assembly delayed the effective date of this law for 18 months.

19. I also estimate that this process would cost the BMV up to $1 million in IT and administrative resources. The primary cost would come from developing a system to create and store a separate voter record for individuals who do not obtain BMV credentials but submit voter registration applications through BMV.

20. The administrative costs would not be borne by BMV alone. If deputy registrars were required to offer voter registration applications to individuals who do not complete applications for driver's licenses, deputy registrars would incur significant financial harm.

21. Deputy registrars are independent contractors who make money through transaction fees collected in conjunction with BMV transactions like driver's license issuances, vehicle registrations, etc. Of course, no fee is collected for registering to vote, and the deputy registrars are not permitted to collect any such fee. Voter registration transactions are among the very few transactions during which the deputy registrar is not permitted to collect a fee. The other fee-free transactions include certain kinds of vision testing, gratis plates for disabled veterans, and the addition of medical restrictions to driver's licenses. Voter registrations are by far the most common type of fee-free transaction performed at deputy registrars' offices.

22. If deputy registrars are forced to conduct voter registration transactions unaccompanied by any fee-paying transaction for a driver's license, the deputy registrars would suffer financial harm. They would not be able to collect fees for these transactions, and further, the time spent on them would decrease the number of fee-paying transactions a deputy registrar could process.

23. If deputy registrars were forced to conduct no-fee voter registration transactions for every failed driver's license applicant, deputy registrars' offices would become less profitable. It is already difficult for BMV to secure bidders for contracts to operate deputy registrars' offices because the margins are so tight. Significant increases to the amount of no-fee transactions performed at the BMV would worsen this problem and could even cause deputy registrars in some areas to close because they could not remain profitable.

24. Customers would likewise face potentially significantly longer wait times at deputy registrars' offices if deputy registrars were forced to conduct voter registration transactions during failed driver's license transactions. Under current practice, many deputy registrars triage customer transactions at the door. Deputy registrars confirm that customers have all the documents needed to complete their desired transaction before customers wait in line. If the customer does not have sufficient documents, the customer is told immediately that the driver's license transaction cannot occur and advised to return with the missing documents. If deputy registrars are forced to offer voter registration to customers in this circumstance, deputy registrars will not be able to triage at the door. This will increase wait times for all.

25. Even if BMV were required only to offer paper registration forms for unsuccessful driver's license applicants, not transactions through BASS, the burdens would still be severe. First, BMV would need to develop new processes and training for deputy registrars for a new type of transaction: voter registration unaccompanied by a BMV transaction. Second, the process would need to be designed to capture all information collected in the abandoned driver's license application and copy that information to the voter registration form. The NVRA prohibits states from requiring voter registration information that duplicates information required in the driver's license application. 52 U.S.C. 20504(c)(2). Third, BMV and the Secretary's Office would need to

develop a process to identify and reconcile duplicate registrations as set forth in Paragraphs 16-17 *supra*. Fourth, all the burdens on deputy registrars described in Paragraphs 20-24 would persist.

26. The identity-confirmation portion of a driver's license application does not represent the full application for a customer. Under Ohio Rev. Code § 4507.51, applications must include the applicant's "willingness to make an anatomical gift," "whether the applicant has executed a valid durable power of attorney for health care," and "whether the applicant is a veteran." Applicants must also have passed a driving skills test or demonstrated licensure from other states, be photographed, and complete a vision test. Because a driver's license application has so many components, the BMV does not deem an application to be "submitted" to it unless and until all the required components are present and approved by the deputy registrar.

27. The BMV does not consider an application for a driver's license to be "submitted" when a customer fills out Column A of BMV Form 5745 and presents it to the deputy registrar. A customer who fills out a Form 5745 may not have submitted or completed the other components of a driver's license application set forth in Paragraph 26 *supra*. Further, it is not uncommon for customers to complete the Form 5745 with the assistance of a deputy registrar during the credentialing transaction. If the deputy registrar discovers that the customer does not have the required documents, the transaction ends, and the Form 5745 is not completed. Additionally, the Form 5745 is not required for all driver license or identification card transactions. For example, when a customer presents their current driver license at a renewal and there are no personal identity updates, Form 5745 is not completed by the customer.

28. Likewise, the BMV does not consider a renewal application for a driver's license to be "submitted" to it unless and until all the required components are present and approved by the deputy registrar. Because customers can renew driver's licenses online, customers frequently begin and abandon renewal applications at various points during the transaction.

I declare under the penalty of perjury that the foregoing is true and correct.

Sydney King

Sydney King

8/26/26

DATE