UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RED WINE & BLUE, *et al.*,<br><br>Plaintiffs<br><br>v.<br><br>FRANK LAROSE, in his official capacity as Ohio Secretary of State, *et al.*,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:25 CV 1760<br><br>JUDGE SOLOMON OLIVER, JR.<br><br><br><br><br><br><br><br><u>ORDER</u> |

Currently pending before the court in the above-captioned case is Defendants Ohio Secretary of State Frank LaRose and Ohio's Registrar of Motor Vehicles Charles L. Norman's Motion for Stay Pending Appeal ("Motion") (ECF No. 59). For the following reasons, the court denies the Motion.

**I. BACKGROUND**

This case concerns Ohio's process for offering voter registration applications in conjunction with driver's license applications at the Bureau of Motor Vehicles ("BMV"). The National Voter Registration Act ("NVRA" or the "Act") "requires States to provide simplified systems for registering to vote in federal elections[.]" *Young v. Fordice*, 520 U.S. 273, 275 (1997) (emphasis omitted). One of these "simplified systems" is by application to vote made simultaneously with a state driver's license application. Section 5 of the NVRA governs this registration method. The provision's general command is that:

> Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle

> authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

52 U.S.C. § 20504(a)(1). States have some flexibility in how they implement this provision of the NVRA, but the Act makes clear what the voter registration application portion of the driver's license application "may not require" and "may require," § 20504(c)(2)(A)–(B), as well as what it "shall include." § 20504(c)(2)(C)–(D).

On August 22, 2025, Plaintiffs Red Wine & Blue ("RWB") and Ohio Alliance for Retired Americans ("the Alliance") (collectively, "Plaintiffs") filed a three-count Complaint for Declaratory and Injunctive Relief (ECF No. 1) against Defendants Frank LaRose, in his official capacity as Ohio Secretary of State, and Charles L. Norman, in his official capacity as Ohio's Registrar of Motor Vehicles (collectively, "Defendants"). Plaintiffs allege that Ohio Revised Code § 3503.11(A)(1), as amended by House Bill 54 ("H.B. 54"), conflicts with the NVRA because it requires people seeking to register to vote at the BMV in conjunction with their driver's license application or renewal to produce documentary proof of citizenship ("DPOC") before being offered a voter registration application. (Compl. ¶ 11.) Such a requirement, Plaintiffs contend, violates the NVRA because it exceeds "the minimum amount of information necessary" to assess an applicant's eligibility to vote (Counts I and II). (*Id.*) Plaintiffs also assert that the Ohio law is impermissibly vague in violation of the First and Fourteenth Amendments (Count III). (*Id.*)

On September 18, 2025, Defendants filed their Answer (ECF No. 14), as well as a Combined Motion to Dismiss and Partial Motion for Judgment on the Pleadings (ECF No. 15). Plaintiffs filed their Opposition to the Combined Motion (ECF No. 25) on October 20, 2025, to which Defendants filed their Reply in Support (ECF No. 26) on November 3, 2025. Then, on January 6, 2026, Defendants filed a Notice of Supplemental Authority regarding Senate Bill 293 ("S.B. 293"), which

was signed into law on December 19, 2025. (Defs.' Notice of Suppl. Auth., ECF No. 28.) S.B. 293 amended various parts of Title 35, including the definitions section, adding a definition of "proof of citizenship" to Ohio Revised Code § 3501.01. (*Id.* at PageID 309.) Plaintiffs did not state their position on the Notice.

On April 28, 2026, Plaintiffs filed a Motion for Preliminary Injunction (ECF No. 29) as to Count I of their Complaint. Shortly after, on May 13, 2026, Defendants moved to stay any preliminary injunction proceedings until the court ruled on its Combined Motion to Dismiss. (*See* ECF No. 32.) Plaintiffs opposed the stay on May 22, 2026 (ECF No. 33), and on May 27, 2026, the court denied Defendants' motion to stay and set forth an expedited briefing and hearing schedule on Plaintiffs' Preliminary Injunction Motion. (Order, ECF No. 34.)

The court held a Preliminary Injunction Hearing on June 25, 2026. Two months later, on August 25, 2026, the court issued an Order granting Plaintiffs' Preliminary Injunction Motion (ECF No. 57) and enjoining enforcement of Ohio Revised Code § 3503.11(A)(1), as amended by House Bill 54. The following day, on August 26, 2026, Defendants filed the instant Motion for Stay Pending Appeal (ECF No. 59). Plaintiffs filed an Opposition (ECF No. 60) to the Motion on September 3, 2026, and Defendants filed a Reply in Support of the Motion to Stay (ECF No. 61) on September 4, 2026.

Defendants' Motion to Stay Pending Appeal is now ripe for adjudication.

## II. LAW AND ANALYSIS

The Sixth Circuit has set forth four factors that govern the court's decision whether to stay an order pending appeal: "1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; 2) the likelihood that the moving party will be irreparably harmed absent a stay; 3) the prospect that others will be harmed if the court grants the stay; and 4) the public interest in granting

the stay." *Grutter v. Bollinger*, 247 F.3d 631, 632 (6th Cir. 2001) (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). The likelihood of success on the merits that the movant must show is inversely proportional to the likelihood of irreparable harm shown. *Id.* at 633. Even if the movant has shown irreparable harm that "decidedly outweighs" harm to others because of the stay, the movant must at least demonstrate that "serious questions" exist as to the merits of the appeal. *Id.* The four factors "are not prerequisites but are interconnected considerations that must be balanced together." *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006).

**A. Likelihood of Success on the Merits**

Defendants contend that they are likely to succeed on the merits of the appeal because (1) the court wrongly interpreted Section 5 of the NVRA to apply to incomplete driver's license applications; (2) the court conflated the terms "requirement" and "information" when discussing Defense counsel's purported concession at the Hearing; and (3) the court's decision "sets the NVRA on a collision course with Ohio's own constitutional powers." (Mot. at PageID 1854–59.)

First, with regard to the court's interpretation of Section 5, specifically the phrase "application submitted," Defendants largely rely on the same non-legal assertions the court rejected in granting the Preliminary Injunction. They do not cite any legal authority to support their interpretation that a driver's license application is only "submitted" if it is "complete." Nor do they engage with the court's textual analysis of the NVRA. Instead, Defendants warn that the court's conclusion contradicts "the relevant statutory scheme, BMV practice, and stretches the NVRA far beyond what it can bear." (Mot. at PageID 1856.) These arguments are not a substitute for the textual analysis that questions of statutory interpretation require. *See Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (quoting *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207

(1997)) (explaining courts begin with the statute's text, "giving each word its ordinary, contemporary, common meaning." (internal quotations omitted)). Moreover, Defendants again ignore that the court must "resist reading words [(i.e., "complete")] or elements into [the NVRA] that do not appear on its face." *Cnty. of Oakland v. Fed. Hous. Fin. Agency*, 716 F.3d 935, 940 (6th Cir. 2013) (internal quotations omitted) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004)).

Defendants' purported standing arguments in their hastily filed Reply are also unavailing. In the Reply, Defendants seem to attack the court's analysis of the term "application submitted" by arguing the issue is confined to Section 5(a), which Plaintiffs did not directly discuss in their Complaint and is therefore beyond the scope of the preliminary injunction. (Reply at PageID 1885.) However, Section 5(a), which articulates the motor voter provision's general command, is inseparable from Section 5(c), which explains how States must implement that command. Indeed, Defendants relied heavily on the language of Section 5(a) to bolster their defense that H.B. 54 is not a documentary proof of citizenship requirement, and thus not in conflict with Section 5(c)(2)(B), because the State's duty to offer voter registration applications activates only after a "complete" driver's license application is submitted "under state law." (*See* Tr. at PageID 1655–56.) The court ultimately rejected Defendants' position, and Defendants cannot repackage their unsuccessful argument as a standing issue to now advocate for a stay.

The court is similarly unpersuaded by Defendants' characterization of its colloquy with counsel for Defendants during the Hearing regarding the "minimum amount of information necessary." (Mot. at PageID 1855–56.) It is true that the portion of the Transcript quoted in the court's Order says "minimum requirements" rather than "minimum information." Nonetheless, the conversation immediately preceding that quote makes clear that what counsel for Defendants

conceded at the Hearing was that attestation to citizenship is "the minimum amount of information necessary" to allow Ohio to assess voter eligibility:

> THE COURT: And you would agree for purposes of voting if we just move ahead and get past the BMV requirements for a license, that the minimum amount necessary for purposes of voting in Ohio is sworn declaration. Is that right?
>
> DEFENDANTS: Well, we have the voter registration form in the record. I think it is Exhibit A 6 or A 7, and yes, there is an attestation of citizenship required. There is also other components of the voter registration form. You have to provide your name, address, date of birth.
>
> THE COURT: Right.
>
> DEFENDANTS: I believe you have to provide the last four of your social or your state identification number, driver's license, or state ID card.
>
> THE COURT: When you say minimum --
>
> DEFENDANTS: Right, right. But in terms of what you have to normally put forward outside of the BMV context, that would be the minimum amount necessary, right. The -- you must under any – I just want to be careful, your Honor, that I am answering your questions truthfully and honestly. Under any form of voter registration in Ohio, the applicant must attest to citizenship, residence in the state of Ohio, 30 days before the election and age, that you will be 18 years of age or older at the general election. That attestation is required for every form of registration.
>
> THE COURT: Right, right. And so if you get to the question -- I know you say you don'' get there when you don't get a license, but when you get to the question as it relates to voting --
>
> DEFENDANTS: Right.

THE COURT: -- the minimum amount necessary would be what's done in respect to the other ways of applying for voting, right, outside of the BMV context? I am saying those are consistent.

DEFENDANTS: Yes. If I understand, I think that is correct, yes.

THE COURT: Yeah.

DEFENDANTS: Yes.

THE COURT: Then for purposes of voting, the minimum voting under the Motor Voter Act the minimum requirements are that you have this attestation, right?

DEFENDANTS: Yes.

(Tr. at PageID 1657–59.) Even absent this discussion, Defendants admit in their Opposition Brief that "Ohio's voter registration form simply requires an applicant to attest citizenship under penalty of election falsification." (Opp'n to Prelim. Inj. at PageID 1115.) And, as the court's discussion of Ohio's various voter registration methods shows (*see* Prelim. Inj. Order at PageID 1790–92), applicants must present DPOC only when applying simultaneously with a driver's license at the BMV. If Ohio election officials can assess a potential voter's eligibility based solely on the information provided on the voter registration form, including the applicant's signed attestation to U.S. citizenship, then that information must be "the minimum amount of information necessary[,]" which makes documentary proof of U.S. citizenship something more.[1]

---

[1] The NVRA also requires states to proactively offer voter registration applications to applicants for public services or assistance at designated state agencies. *See* 52 U.S.C. § 20506(a)(6). Consistent with this mandate, Ohio law provides: "(D) Each designated agency shall distribute a voter registration form prescribed by the secretary of state to each applicant with each application for service or assistance, and with each written application or form for recertification, renewal, or change of address." OHIO REV. CODE § 3503.10. Thus, unlike Ohio's motor voter system, this proactive voter registration method does not condition the offer on the presentation of DPOC. This inconsistency further supports the court's finding in the Preliminary

Lastly, the court is unpersuaded by Defendants' slippery slope argument that "the Court's decision sets the NVRA on a collision course with Ohio's own constitutional powers" to determine who may vote in elections. (Mot. at PageID 1857.) The court recognizes that in *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013), the Supreme Court observed that "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them[;]" and that "it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." *Id.* at 16–17. That said, Defendants do not point to any legal authority, binding or otherwise, holding that the NVRA precludes states from obtaining the information necessary to enforce its voter qualifications. Moreover, *Inter Tribal* rejected arguments like Defendants', because the NVRA provided an "alternative means of enforcing its constitutional power to determine voting qualifications," as related to the Federal Voter Registration Form. *Id.* at 18–19.

Additionally, other Supreme Court precedent recognizes that "the responsibility of the States for setting the qualifications of voters in congressional elections was made subject to the power of Congress to make or alter such regulations, if it deemed it advisable to do so." *Oregon v. Mitchell*, 400 U.S. 112, 119 (1970). For example, in *Mitchell*, the Supreme Court held that Congress acted within its constitutional authority when it amended the Voting Rights Act to enfranchise 18-year-olds in federal elections, and to set residency requirements and provide for absentee balloting in elections for presidential and vice-presidential electors. *Id.* at 117–18. Thus, when it comes to a state's power to make laws regarding national elections, "if Congress bec[omes] dissatisfied with the state laws, Congress [can] alter them." *Id.* at 123. *See cf. Tashjian v. Republican Party of Conn.*,

---

Injunction Order that documentary proof of citizenship is more than "the minimum amount of information necessary" for Ohio election officials to assess an applicant's eligibility.

479 U.S. 208, 229 (1986) (holding that primary elections are subject to the Qualifications Clause of the Constitution, and the Seventeenth Amendment, but that they "do not require a perfect symmetry of voter qualifications in state and federal legislative elections").

Accordingly, the court concludes that Defendants have not demonstrated a likelihood of success on the merits of the appeal, and thus, this factor weighs against a stay of the Injunction.

**B. Likelihood of Irreparable Harm to Defendants**

Defendants maintain that they will be irreparably harmed absent a stay because the court's preliminary injunction is impermissibly vague and imposes immense administrative burdens on the BMV and election officials. (Mot. at PageID 1848–50, 1852–54.) Both arguments are unconvincing. First, the Injunction is not "impermissibly vague," nor does it present "internal inconsistencies." The Injunction plainly states that "a driver's license application is submitted under Section 5 of the NVRA when the applicant presents a BMV Form with Column A filled out to the deputy registrar," and that "[i]t is at that moment that Section 5 requires Ohio to affirmatively offer the driver's license applicant the opportunity to register to vote." (Prelim. Inj. Order at PageID 1815.)

Second, the Injunction does not contradict itself as to which driver's license applicants the Order applies. The court makes clear that if a driver's license applicant submits BMV Form 5745 to the deputy registrar, and that form indicates in Column A that the applicant is a noncitizen or otherwise presents information demonstrating the applicant is a noncitizen, then the BMV is not ordered to offer the applicant the opportunity to register to vote because it knows the applicant's citizenship. (*Id.* at PageID 1842.) Thus, the Injunction "describe[s] in reasonable detail…the act or acts restrained or required," FED. R. CIV. P. 65(d)(1)(C), and, it permissibly "provid[es] the state a wide berth to design and implement the specific procedures for complying with the district court's order[.]" *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 241 (6th Cir. 2011).

Defendants' concerns about the administrative burdens of implementing the Injunction also ring hollow. By not specifying the exact procedures, the court lets Defendants decide the least burdensome method for executing the court's order. Indeed, the record shows that there is at least one readily available way for Defendants to comply with the Injunction: proactively offering the paper voter registration applications already at the BMV to eligible citizens rather than only upon request. In fact, Defendants have touted the ease with which an unsuccessful driver's license applicant can submit a paper voter registration application to the deputy registrar *if* the applicant requests one. (Opp'n to Prelim. Inj. at PageID 1118.) But, as the court's Order explained, the onus should not be on the unsuccessful driver's license applicant to request a voter registration application, but on the BMV to proactively offer the voter registration opportunity as Section 5 of the NVRA intended.

Defendants assert that this compliance method may mean that the voter registration portion "duplicates information required in the driver's license portion of the form," something that Section 5 of the NVRA forbids. *See* 52 U.S.C. § 20504(c)(2)(A). (Mot. at PageID 1854.) Plaintiffs acknowledge this potential conflict and observe that Defendants "may *later* need to further adjust their BMV voter registration process in other ways to ensure complete compliance with the NVRA." (Opp'n to Stay at PageID 1877, n.3.) However, Plaintiffs contend that the Injunction's terms do not presently require that relief, and that offering paper voter registration applications is "an interim remedy that resolves the most pressing threat of irreparable harm: the possibility that Plaintiffs' members will miss their chance to vote because they were not offered registration at the BMV in contravention of federal law." (*Id.*) The court agrees.[2]

[2] Further, this interim solution appears consistent with Congress's intent in writing Section 5(c) as it did: "Section 5(c) is so drafted to describe an application process that permits the use of two forms, one for the motor vehicle driver's license application and one for the

Lastly, Defendants assert that requiring deputy registrars to offer voter registration applications to unsuccessful driver's license applicants would result in duplicate registrations, thereby burdening the Secretary of State's office. (Mot. at PageID 1853.) This argument is similarly unavailing. First, submitting a voter registration application to the deputy registrar does not automatically add someone to Ohio's voter rolls. Instead, the application is transmitted to election officials who assess the application and determine whether the prospective voter meets eligibility requirements. Second, Ohio election officials already have in place a process for removing duplicate registrations—a process that, according to the Secretary of State's office, is effective: "Ohio also closely monitors duplicate registrations, keeping them consistently below 0.30 percent. As an additional safeguard, the state requires that all duplicate registrations be eliminated entirely, long before Election Day." Press Release, Ohio Sec'y of State, Secretary LaRose Directs Election Officials to Begin New Round of Voter List Audits (July 29, 2025), https://www.ohiosos.gov/office/media-center/categories/press-releases/2025-07-29. *See also* OHIO REV. CODE 3503.21(A)(15) ("The registration of a registered elector shall be canceled upon the occurrence of any of the following:…(15) The determination by the board of elections that the registration is a duplicate."). As such, any additional burden placed on the Secretary of State for reconciling duplicate registrations is not outweighed by the irreparable harm inflicted on otherwise eligible citizens from not receiving a proactive offer to register to vote by the registration deadline for the 2026 general election.

---

voting registration application, thereby avoiding any cost associated with revamping current procedures or computer programs...Where two forms are used, it is expected and intended that such forms will be used simultaneously as part of a single, integrated application process. All applicants appearing at the motor vehicle office must be given an application that includes both forms." H. Rep. No. 103-9, at 9; S. Rep. No. 103-6, at 25.

Fundamentally, Defendants' arguments that the Injunction irreparably harms them because it imposes "immense administrative burdens" reveal either that Ohio cannot do what the NVRA requires, or it simply does not want to. Neither is a sound basis for staying the Injunction. Therefore, the court does not find that Defendants will be irreparably harmed absent a stay of the court's Preliminary Injunction.

**C. Prospect of Harm to Others and Public Interest**

Defendants argue that a stay will not harm Plaintiffs because Plaintiff Red Wine & Blue's named members have successfully registered to vote, and there is no evidence in the record to support that future Ohioans will suffer the same harm. (Mot. at PageID 1854.) Further, they contend that the public interest favors a stay to "give effect to the will of the people by enforcing the laws…their representatives enact." (*Id.*) (quoting *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020)). *Thompson* is inapposite because there, the Sixth Circuit determined that plaintiffs failed to establish a likelihood of success on the merits of their election law claim. *Thompson*, 976 F.3d at 619 ("Because we've already found that Ohio is likely to prevail on the merits here, it would cause the State irreparable harm if we blocked it from enforcing its constitutional ballot access laws.")

Here, the court concluded that Plaintiffs have established a strong likelihood of success on the merits of their challenge to Ohio's motor voter law, and there is nothing new in the record to persuade the court otherwise. As such, the Injunction blocks Defendants from enforcing an unlawful statute, which the public interest inherently favors.

The court also reiterates that Ohio's voter registration scheme outside the BMV context and Defendants' Hearing statements show that election officials do not need documentary proof of citizenship to assess a voter registration applicant's citizenship because signed attestation of citizenship is enough. (Tr. at PageID 1659; *see also id.* at PageID 1657–58, 1673.) Accordingly,

Ohio's interest in allowing statutory processes to operate to preclude noncitizen voting is still represented if H.B. 54 is enjoined. Conversely, the "strong public interest in allowing every registered voter to vote," *Summit Cnty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004), which extends to voter registration and ensuring as many eligible U.S. citizens as possible become registered to vote, will be denied absent an injunction. Such an outcome would be contrary to the NVRA's purpose, and a strain on the fundamental right to vote.

Therefore, the court finds that the potential harm to others and the public interest weigh against staying the August 25, 2025 Preliminary Injunction.

**D. *Purcell* Doctrine**

Defendants argue that the *Purcell* doctrine requires staying the Injunction because it was entered less than six weeks before the close of voter registration, and it imposes immense burdens on the BMV and election officials. (Mot. at PageID 1850.) In *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court said, "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5. However, how close is too close remains unsettled. *Compare U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 387 (6th Cir. 2008) (denying stay of injunction order issued less than one month before the 2008 general election in an NVRA violation case), *with Tenn. Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, 105 F.4th 888, 890 (6th Cir. 2024) (granting stay of injunction order issued less than a month before the voter registration deadline for the upcoming election).

Here, the court issued the Injunction on August 25, 2026—approximately six weeks ahead of Ohio's October 5, 2026, voter registration deadline. Thus, unlike the injunction in *Tennessee Conf. of the NAACP*, the Order came more than a month before the voter registration deadline. Moreover,

*Purcell* "demands 'careful consideration' of any legal challenges that involves 'the possibility that qualified voters might be turned away from the polls.'" *Land*, 546 F.3d at 387 (quoting *Purcell*, 549 U.S. at 7). If an eligible citizen misses the voter registration deadline because he or she was not proactively offered the opportunity to register to vote in conjunction with a driver's license application, then he or she is effectively "turned away from the polls." Accordingly, the court concludes that the *Purcell* doctrine does not demand a stay of the August 25, 2025 Injunction.

**E. Mootness**

The court is similarly unpersuaded by the mootness arguments raised in Defendants' Reply in Support of the Motion to Stay (ECF No. 61). This case does involve wrongs that are "capable of repetition, yet evading review," *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 3d 579, 584 (6th Cir. 2006), and neither of the cases relied on by Defendants convince the court otherwise. In *Memphis A. Philip Randolph Institute v. Hargett*, 2 F.4th 548 (6th Cir. 2021), organizational plaintiffs whose members sought to vote by absentee ballot in the 2020 election challenged a Tennessee law requiring first-time voters who registered by mail or online to vote in person unless a limited exception applies. *Id.* at 553–54. Central to the plaintiffs' claims was the COVID-19 pandemic, "a once-in-a-century crisis" that had increased interest in absentee voting. *Id.* at 560. The district court granted the plaintiffs' motion for preliminary injunction on September 9, 2020, and enjoined enforcement of first-time voter restriction. *Id.* at 554.

Following the 2020 election, and after denying the defendants' motion to stay pending appeal, the Sixth Circuit reached the merits of the district court's preliminary injunction. *Id.* The *Hargett* court determined that the plaintiffs' claims were moot because the individual member identified for the purpose of standing no longer qualified to cast an absentee ballot, and the mootness exception did not apply because the member's alleged injury and preliminary injunction motion were

"inextricably tied to the COVID-19 pandemic." *Id.* at 558–561. Thus, "[t]he unique factual situation of th[at] case ma[de] it one of the rare election cases where the challenged action [was] not capable of repetition." *Id.* at 561. *See also Thompson v. DeWine*, 7 F.4th 521, 525–26 (6th Cir. 2021) (declining to apply capable-of-repetition-yet-evading-review exception because "plaintiffs' claims are inextricably tied to the COVID-19 pandemic" (internal quotations omitted)). Such a "unique factual situation" does not exist here. Rather, as the court explained in the Injunction Order, "the controversy almost invariably will recur" with respect to some future Ohio resident who is a member of one of the Plaintiff organizations and who seeks to register to vote in conjunction with a driver's license application. (Prelim. Inj. Order at PageID 1828) (quoting *Lawrence v. Blackwell*, 430 F.3d 368, 372 (6th Cir. 2005)).

*R.K. ex rel. J.K. v. Lee*, 53 F. 4th 995 (6th Cir. 2022) is similarly distinguishable because it does not involve an election law issue, and it again deals with claims largely related to the COVID-19 pandemic. *See id.* at 1002. Moreover, it does not support Defendants' proposition that "[t]he Sixth Circuit routinely stays orders based on standing and mootness problems," (Reply at PageID 1886), given the *Lee* court denied staying the district court's injunction pending appeal. *R.K. ex rel. J.K. v. Lee*, No. 22-5004, 2022 WL 1467651, at *3 (6th Cir. May 10, 2022) ("Accordingly, the motion to stay the district court's preliminary injunction pending appeal is DENIED."); *see also Hargett*, 977 F.3d at 569 ("Defendants' motion for stay is denied.")

## IV. CONCLUSION

Defendants do not offer any new evidence or legal arguments to persuade the court that they have a likelihood of success on the merits of the appeal, or that they will be irreparably harmed absent a stay. The court's Injunction Order plainly describes who it enjoins and the conduct it prohibits. The court does not order a remedy that upsets Ohio's ability to establish and implement

its requirements for issuing driver's licenses, nor does it hamstring the State's authority to set and enforce voter qualifications.

What the Injunction Order does do is enjoin the enforcement of a statute that violates federal law and hinders eligible citizens' fundamental right to vote. The NVRA was enacted to make voter registration for federal elections easier, not more arduous. The court's order does no more than actualize Congress's "attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements[.]" *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997). Therefore, the court denies Defendants' Motion for Stay Pending Appeal (ECF No. 59). Defendants shall comply with the Preliminary Injunction Order (ECF No. 57) forthwith.

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

September 9, 2026